*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2017 UT 46**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Respondent,*
*v.*

DENNIS WAYNE LAMBDIN,
*Petitioner.*

No. 20150752
Filed August 11, 2017

On Certiorari to the Utah Court of Appeals

Third District, Salt Lake
The Honorable Vernice S. Trease
No. 091906736

Attorneys:

Sean D. Reyes, Att'y Gen., Karen A. Klucznik, Asst. Solic. Gen.,
Salt Lake City, for respondent

McCaye Christianson, Alexandra S. McCallum, Salt Lake City,
for petitioner

JUSTICE DURHAM authored the opinion of the Court, in which
ASSOCIATE CHIEF JUSTICE LEE and JUDGE CONNORS joined.

CHIEF JUSTICE DURRANT authored a dissenting opinion in which
JUSTICE HIMONAS joined.

Having recused himself, JUSTICE PEARCE does not participate herein;
DISTRICT COURT JUDGE DAVID CONNORS sat.

JUSTICE DURHAM, opinion of the Court:

## INTRODUCTION

¶1    Dennis Lambdin was married for approximately nine years before brutally killing his wife. While he admitted to the killing, he sought to reduce the conviction from murder to manslaughter by establishing special mitigation through extreme emotional distress. At trial the jury convicted him of murder, rejecting his arguments for

special mitigation. Mr. Lambdin appealed his conviction of murder to the court of appeals, arguing that the district court's jury instructions concerning extreme emotional distress were in error. The court of appeals affirmed the conviction. We granted certiorari to review the court of appeals' decision, and affirm.

## BACKGROUND

¶2 Mr. Lambdin married the victim in 2000. Throughout the marriage, the victim had a drinking and gambling problem, which caused distress to Mr. Lambdin. In June 2009, she asked Mr. Lambdin for a divorce. Later, Mr. Lambdin found romantic messages on the victim's cell phone from another man, and around the same time, the victim informed Mr. Lambdin that she was pregnant with another man's child. Mr. Lambdin told a co-worker of his wife's infidelity and his distress, and the co-worker requested that the police conduct a welfare check at Mr. Lambdin's home because she was concerned for his safety. The police visited Mr. Lambdin and found that he had a very calm demeanor despite having just discussed the pregnancy with the victim. He told police that the affair "doesn't really matter. It's over. I'm past it now. It is time to move on."

¶3 The couple continued to discuss divorce off and on for roughly two months, with Mr. Lambdin trying to convince the victim to stay in the marriage. On the evening of August 16, 2009, Mr. Lambdin and the victim again argued over whether they should divorce. After the argument, Mr. Lambdin made the victim coffee, and she then left their home to work a night shift at her job.

¶4 Mr. Lambdin stayed up most of the night. Around midnight, Mr. Lambdin wrote two letters. The first letter, written in the past tense, explained that he had killed the victim and committed suicide. This letter also gave explanations for why he planned to do it, including the statement that, "she deserves what she got and I won't be around to suffer anymore." The second letter, apparently written to a neighbor, said "I couldn't take this shit any longer. I had to do this and I'm glad I did. It serves her right for all she has done to me."

¶5 Mr. Lambdin printed a copy of these two letters and left them on his computer desk. About seven hours after the letters were written, the victim came home from work. Mr. Lambdin met her in the kitchen and began discussing divorce again. He said, "do we really have to go through all of this stuff" and "lose everything that we got." The victim responded by telling him "you're crazy," and that he needed to move

out. At this point, Mr. Lambdin told police that he "just lost it."[1] He explained to the police that, "[a]ll I wanted was some resolve with her, to get back what I've given her for the last 9½ years. The love and the affection. And she just talked to me like I was a stranger. A piece of shit. Insults me."

¶6   Mr. Lambdin punched the victim "about four or five times," and then threw her to the floor. Then he grabbed the biggest kitchen knife he could find and began stabbing her. After he stabbed her the first time, the victim screamed, "okay!" But Mr. Lambdin responded "it's too late," and you "get what you deserve." He continued to stab the victim at least fifteen times in the back and neck while she was screaming. After repeatedly stabbing the victim, he noticed that she was still moving. Mr. Lambdin told police that he "didn't want to stab her anymore" and that he "didn't want her to suffer." So, Mr. Lambdin grabbed a "big decorated ball" and "smashed her in the back of the head with it three times," until she stopped moving. The victim died in the attack.

¶7   According to Mr. Lambdin's statement to the police, he went out onto his deck and smoked a cigarette after killing the victim. He then went to Home Depot to buy some rope with which to hang himself. He came home and tied the rope to an attic beam and began drinking heavily "to get the balls to" commit suicide. While drinking, he messaged a friend telling her what he had done. The friend called the police, who arrived at the scene shortly thereafter.

¶8   During the attack, Mr. Lambdin had cut his hand on the kitchen knife, and EMTs transported him to a hospital for treatment. On the way to the hospital, Mr. Lambdin informed the EMTs that "he had stabbed his wife" and "that when she continued to move he grabbed a glass globe and bashed her head." He told the EMTs multiple times that "the bitch got what she deserved." Mr. Lambdin continued to make similar comments to hospital staff. He made the comment that "he couldn't take it anymore," and that he had killed his wife. When asked how he had cut his hand, he "just laughed about it and said, 'I killed that woman. I stabbed her. She got what she deserved.'"

¶9   The police officer who responded to the incident testified that, immediately after he arrived on the scene, during the ambulance ride, and at the hospital, Mr. Lambdin displayed a wide spectrum of

---

[1] Mr. Lambdin's statements are taken from a police interview conducted shortly after he killed the victim.

emotions, from laughing about the attack and seeming very excited to becoming very angry. The officer testified that Mr. Lambdin seemed to have an, "oh, my gosh . . . what did I just do," attitude, but that he did not cry.

¶10 The State charged Mr. Lambdin with murder. Mr. Lambdin sought to reduce the level of his offense to manslaughter by proving special mitigation by extreme emotional distress. The district court proposed its own jury instructions; Mr. Lambdin objected to the instructions concerning special mitigation, but the court overruled his objections. The jury convicted Mr. Lambdin of murder, unanimously finding that he had failed to establish special mitigation by extreme emotional distress. Mr. Lambdin appealed, and the court of appeals affirmed the district court's jury instructions. We granted certiorari to review the court of appeals.

## STANDARD OF REVIEW

¶11 "On certiorari, we review the decision of the court of appeals for correctness, without deference to its conclusions of law." *State v. Smith*, 2014 UT 33, ¶ 9, 344 P.3d 573 (citation omitted). Also, "we review a court's ruling on a proposed jury instruction for correctness." *State v. Maestas*, 2012 UT 46, ¶ 148, 299 P.3d 892.

## ANALYSIS

¶12 Utah Code section 76-5-205.5 governs special mitigation in criminal homicide cases. Special mitigation allows a defendant charged with criminal homicide to reduce the level of the offense. UTAH CODE § 76-5-205.5(5). Extreme emotional distress is one category of special mitigation. *Id.* § 76-5-205.5(1)(b). If a jury "finds the elements [of murder] are proven beyond a reasonable doubt" by the State, and the jury unanimously finds the elements of extreme emotional distress are "established by a preponderance of the evidence" by the defendant, the jury must reduce the verdict from murder to manslaughter. *Id.* § 76-5-205.5(5)(a).

¶13 Extreme emotional distress is established by proving 1) the defendant "cause[d] the death of another," 2) "under the influence of extreme emotional distress," 3) "for which there is a reasonable explanation or excuse." *Id.* § 76-5-205.5(1). The statute provides further guidance on the second and third elements. Under the second element, extreme emotional distress does not include "a condition resulting from mental illness as defined in Section 76-2-305" or "distress that is substantially caused by the defendant's own conduct." *Id.* § 76-5-205.5(3). Under the third element, the "reasonableness of an explanation or excuse" for the extreme emotional distress "shall be determined from the viewpoint of a reasonable person under the then

existing circumstances." *Id*. § 76-5-205.5(4). There is no further statutory definition or explanation of the term "extreme emotional distress."

¶14 Mr. Lambdin argues that our definition of extreme emotional distress in *State v. Bishop*, 753 P.2d 439 (Utah 1988), *overruled on other grounds by State v. Menzies*, 889 P.2d 393 (Utah 1994), is *dicta* and that "it was error to turn that dictum into affirmative statements of the law" that were used to provide the language for the jury instructions in this case. He next argues that this court's precedent, and the court of appeals in this case, was incorrect in holding that special mitigation by extreme emotional distress requires a jury to look at "the reasonableness of the [defendant's] loss of [self-]control." *State v. Lambdin*, 2015 UT App 176, ¶ 12, 356 P.3d 165. Finally, he argues that the jury instructions in this case were incorrect and prejudiced his verdict. We address each of these arguments.

## I. *BISHOP*'S DEFINITION OF EXTREME EMOTIONAL DISTRESS IS ACCURATE

¶15 In *State v. Bishop*, this court defined "extreme emotional disturbance" in connection with the statutory defense to the crime of murder.[2] 753 P.2d 439, 467–72 (Utah 1988), *overruled on other grounds by State v. Menzies*, 889 P.2d 393 (Utah 1994). In that case, we stated that a person suffers from extreme emotional distress:

> (1) when he has no mental illness as defined in section 76–2–305 (insanity or diminished capacity); and

> (2) when he is *exposed* to extremely unusual and overwhelming stress; and

---

[2] *Bishop* analyzed an older version of the criminal code. Under that version, extreme emotional disturbance was a defense that downgraded murder to manslaughter. *See* UTAH CODE § 76-5-205(1) (1985) ("Criminal homicide constitutes manslaughter if the actor . . . [c]auses the death of another under the influence of extreme emotional disturbance for which there is a reasonable explanation or excuse."). Over the years, the legislature has made various changes to the law, but the core provisions have remained substantially the same. *Infra* ¶ 28 n.4. Mr. Lambdin does not argue that the change in language from "disturbance" to "distress" should alter *Bishop*'s definition, and we see no reason why it should. Thus, we use extreme emotional disturbance and extreme emotional distress interchangeably. *See State v. Shumway*, 2002 UT 124, ¶¶ 8–13, 63 P.3d 94 (using "disturbance" and "distress" interchangeably).

(3) when the average reasonable person under that stress would have an extreme emotional reaction to it, as a result of which he would experience a loss of self-control and that person's reason would be overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation, or other similar emotions.

*Id.* at 471.

¶16 Mr. Lambdin argues that Utah Code section 76-5-205.5 "sets forth all the elements jurors need to know to understand and apply the law," and therefore "there is no need for a court to define [extreme emotional distress] beyond" what is listed in the statute. He argues that we should abandon our definition of extreme emotional distress because the term has an ordinary, non-technical meaning accessible to jurors, and because our definition of that term in *Bishop* is "pure dicta."

¶17 Mr. Lambdin cites *State v. Couch* for the proposition that "[i]t is normally unnecessary and undesirable for a trial judge to volunteer definitions of terms of common usage for the jury." 635 P.2d 89, 94 (Utah 1981). Mr. Lambdin argues that extreme emotional distress has an ordinary, dictionary meaning, and therefore we should not have defined it in *Bishop* because our definition could be used at some future point by a district court in its jury instructions. This proposition is completely at odds with our implied constitutional authority to interpret the law in order to address the merits of cases before us. *See* UTAH CONST. art. VIII, § 1 ("The judicial power of the state shall be vested in a Supreme Court . . . ."); *id.* art. VIII, § 3 ("The Supreme Court shall have . . . power to issue all . . . orders necessary for . . . the complete determination of any cause."); *State v. Walker*, 2011 UT 53, ¶ 31, 267 P.3d 210 (Lee, J., concurring) ("[T]he role of modern judges is to interpret the law . . . and then to apply it to the facts of the cases that come before them. The process of interpretation, moreover, involves . . . a determination of what the law is as handed down by the legislature . . . ." (footnote omitted)).

¶18 When this court applies a statute to a given case, it is often necessary to interpret the statute to determine the proper outcome. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule."). When interpreting a statute in order to apply it to the facts of a case, our primary goal is to determine the intent of the legislature. *See Walker*, 2011 UT 53, ¶ 31 (Lee, J. concurring) ("The judge . . . is not a primary lawgiver but instead an agent for the legislature . . . ."); *Monarrez v. Utah Dep't of Transp.*, 2016 UT 10, ¶ 11, 368 P.3d 846 ("When interpreting a statute, it

is axiomatic that this court's primary goal 'is to give effect to the legislature's intent in light of the purpose that the statute was meant to achieve.'" (citations omitted)).

¶19 Because we are merely determining the legislature's intent when we interpret a statute, our interpretation does not create new law, it says what the law is. Additionally, jury instructions are intended to inform jurors of the applicable law. *State v. Powell*, 2007 UT 9, ¶ 11, 154 P.3d 788 ("[J]ury instructions are statements of the law . . . ." (citation omitted)). Thus, there is no error when a district court includes our interpretation of a statutory term in instructions for the jury, because that interpretation is simply a statement of the law. UTAH R. CRIM. P. 19(a) ("[T]he court may instruct the jury concerning . . . the definition of terms.").

¶20 In *Bishop*, this court was called upon to define extreme emotional disturbance. The fact that there may be an ordinary meaning of extreme emotional disturbance does not affect this court's authority to determine if the ordinary meaning is the meaning that the legislature intended. We therefore reject Mr. Lambdin's argument that it is improper for this court to adopt any definition of extreme emotional distress.

¶21 We likewise reject Mr. Lambdin's request to abandon *Bishop*'s definition of extreme emotional distress as "pure dicta." Whether or not it was *dicta* in *Bishop*,[3] the definition has been used many times by this court since *Bishop* was issued. *See, e.g., State v. White*, 2011 UT 21, ¶¶ 26–27, 251 P.3d 820; *State v. Spillers*, 2007 UT 13, ¶ 14, 152 P.3d 315, *abrogated on other grounds by State v. Reece*, 2015 UT 45, 349 P.3d 712; *State v. Shumway*, 2002 UT 124, ¶ 9, 63 P.3d 94; *State v. Standiford*, 769 P.2d 254, 259–60 (Utah 1988). Mr. Lambdin does not argue that we should overrule any of this precedent, which has clearly established the *Bishop* interpretation as controlling.

---

[3] The reference to "dicta" in *Bishop* comes from a concurring opinion. 753 P.2d at 491 (Durham, J., concurring). The reference was not directed at the interpretation of extreme emotional disturbance. Rather the concurrence argued that the court should not have reached the problem of such an interpretation at all because the jury had found all of the elements of the greater offense in that case, rendering the lesser included (manslaughter) offense analysis moot. Neither the lead opinion nor either of the other two concurring opinions agreed with this argument.

¶22 Furthermore, the *Bishop* definition closely tracks the plain meaning of extreme emotional distress. When interpreting statutes, we look to the ordinary meaning of the words, using the dictionary as our starting point. *State v. Canton*, 2013 UT 44, ¶ 13, 308 P.3d 517. After determining our starting point, we then must look to the "context of the language in question." *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465.

¶23 Here, "extreme" is defined as "very serious or severe." MERRIAM-WEBSTER ONLINE, http://www.merriam-webster.com (last visited Aug. 7, 2017). "Emotion" is defined as "a conscious mental reaction (such as anger or fear) subjectively experienced as strong feeling usually directed toward a specific object and typically accompanied by . . . behavioral changes." *Id.* "Distress" is defined as "pain or suffering." *Id.* Thus, the dictionary meaning of extreme emotional distress is a reaction in which the subject experiences very severe pain or suffering accompanied by strong feelings, such as anger, that is usually directed toward a specific person and typically accompanied by behavioral changes, such as a loss of self-control. This closely tracks our definition in *Bishop*. Additionally, the broad language in the ordinary meaning must be put into the context of the special mitigation statute that allows a criminal defendant to be convicted of the lesser crime of manslaughter. Given this context, the *Bishop* definition is the best formulation of what constitutes extreme emotional distress when one person kills another.

¶24 We hold that Mr. Lambdin has failed to meet his burden of overruling the definition of extreme emotional distress in *Bishop*. We now determine whether that definition requires the defendant to show that his loss of self-control was reasonable.

## II. EXTREME EMOTIONAL DISTRESS REQUIRES A SHOWING THAT A REASONABLE PERSON WOULD LOSE SELF-CONTROL

¶25 Mr. Lambdin argues that even if we maintain *Bishop*'s definition of extreme emotional distress, our opinion in *White* impermissibly extended *Bishop*'s definition by requiring defendants to prove that their loss of self-control was reasonable. In *White*, we stated that "a person acts under the influence of extreme emotional distress when 'he is exposed to extremely unusual and overwhelming stress' that would cause the *average reasonable person under the same circumstances to 'experience a loss of self-control.'" State v. White*, 2011 UT 21, ¶ 26, 251 P.3d 820 (emphasis added) (quoting *State v. Bishop*, 753 P.2d 439, 471 (Utah 1988), *overruled on other grounds by State v. Menzies*, 889 P.2d 393 (Utah 1994)). Mr. Lambdin argues that this framing of *Bishop*'s definition "omits the critical step of an extreme reaction, 'as a result of which he would experience a loss of self-control.'"

¶26 *White*'s formulation is not an extension of *Bishop* at all. It merely restates what was already required under *Bishop*. *Bishop* requires defendants to prove that they were "*exposed* to extremely unusual and overwhelming stress," and that "the *average reasonable person* under that stress would have an extreme emotional reaction to it, as a result of which *he* would experience a loss of self-control and *that person's reason* would be overborne by intense feelings." *Bishop*, 753 P.2d at 471 (all but first emphasis added). When we say, "he," and, "that person[]," we are discussing the average reasonable person referred to earlier. Thus, under *Bishop*, the defendant must prove that the average reasonable person "would experience a loss of self-control," because the average reasonable person's "reason would be overborne by intense feelings."

¶27 Additionally, while we appreciate Mr. Lambdin's detailed argument, we cannot see a difference between establishing that a reasonable person would have an extreme emotional reaction to stress that causes a loss of self-control, and establishing that the same reasonable person would lose self-control due to the overwhelming stress and the extreme emotional reaction. If a reasonable person would lose self-control because of the then-existing circumstances, it necessarily follows that the defendant's loss of self-control must be reasonable.

¶28 This is confirmed by the purpose behind special mitigation by extreme emotional distress. Since Utah's special mitigation by extreme emotional distress statute "was modeled after section 210.3 of the Model Penal Code, the American Law Institute's Commentaries . . . provide insight into the meaning of section 76–5–205 in 1973."[4] *Bishop*,

---

[4] In 1985, the legislature added that "emotional disturbance does not include a condition resulting from mental illness," and that "[t]he reasonableness of an explanation or excuse . . . shall be determined from the viewpoint of a reasonable person under the then existing circumstances." 1985 Utah Laws 436. In 1999, the legislature changed "disturbance" to "distress," moved the defense to another section of the code, made extreme emotional distress an affirmative defense rather than a defense to criminal homicide, and added the requirement that the distress not be "substantially caused by the defendant's own conduct." 1999 Utah Laws 318–19. In 2009, the legislature classified extreme emotional distress as special mitigation rather than an affirmative defense. 2009 Utah Laws 1030-32.

Even though the legislature moved extreme emotional distress around the criminal code, changed it from a defense to an affirmative

(Continued. . .)

753 P.2d at 469. The comments provide that, "[i]n the end, the question [of extreme emotional distress] is whether the actor's loss of self-control can be understood in terms that arouse sympathy in the ordinary citizen." MODEL PENAL CODE § 210.3 cmt. (5)(a) at 63 (AM. LAW INST., Official Draft and Revised Comments 1980). This implies that reasonable jurors could picture themselves, or the hypothetical reasonable person, losing self-control under the then-existing circumstances and doing something they wouldn't normally do when they are thinking and acting rationally.

¶29 Even defense counsel at trial acknowledged this purpose. During closing arguments, she stated,

> when people are highly emotional or agitated they can lose control and they can do things that they normally wouldn't do, things that they wouldn't do when they are in full possession of themselves. And, really, that's what this case is about, isn't it, . . . things can happen when people are overwhelmed by emotion or agitation.

Defense counsel essentially argues that, under the then-existing circumstances, the average reasonable person's self-control would be overcome by feelings such as anger, distress, or excessive agitation and

---

(Continued. . .)

defense and then changed it again to special mitigation and narrowed its scope, none of these changes have so altered extreme emotional distress that the MPC comments are no longer informative about the original purpose in adopting extreme emotional distress. If anything, the legislature has made it more difficult to prove extreme emotional distress, but has left the core provisions largely intact. *Compare* UTAH CODE § 76-5-205(1) (1973) ("Criminal homicide constitutes manslaughter if the actor . . . [c]auses the death of another under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation or excuse."), *with id.* § 76-5-205.5(1) (2016) ("Special mitigation exists when the actor causes the death of another . . . under the influence of extreme emotional distress for which there is a reasonable explanation or excuse."). Mr. Lambdin argues that the legislature intended to "substantially *enlarge[]* the class of cases" available in extreme emotional distress from the more narrow common law heat of passion defense—a fact that we have acknowledged. *White*, 2011 UT 21, ¶ 29 (alteration in original) (citation omitted). However, he has not provided any reason as to why these changes should alter our consideration of the MPC comments in determining the legislative intent behind the core provisions.

that once the reasonable person loses self-control, they could do something they wouldn't normally do— like kill their spouse.

¶30 Additionally, as defense counsel's argument shows, the extreme emotional reaction and the loss of self-control are so intertwined that it is nearly impossible to separate the two. While we have held that the external triggering event and the extreme emotional reaction do not need to be contemporaneous, *White*, 2011 UT 21, ¶ 32, the extreme emotional reaction and the loss of self-control must be contemporaneous. Indeed, if the loss of self-control does not occur while the defendant is experiencing the extreme emotional reaction, then the loss of self-control is not caused by the extreme emotional reaction and special mitigation is not appropriate. Requiring a lay jury to untangle this will only lead to confusion.

¶31 Mr. Lambdin also argues that requiring a defendant to prove his loss of self-control was reasonable impermissibly adds another element to extreme emotional distress. He argues that courts are "not to infer substantive terms into the text" of a statute, *Berrett v. Purser & Edwards*, 876 P.2d 367, 370 (Utah 1994), and that "courts may not denounce and punish as crimes acts and omissions not made punishable by statute, for it is a legislative power to declare acts as crimes," *State v. Gallion*, 572 P.2d 683, 688 (Utah 1977). However, as discussed above, this court has the authority to interpret the law and to determine what the legislature meant when it used specific terms. *Supra* ¶¶ 17–19. There is a difference between interpreting a statute and adding terms to a statute. When we interpret a statute, we seek to determine the legislature's intent in using the words that it chose to use. *State v. Walker*, 2011 UT 53, ¶ 31, 267 P.3d 210 (Lee, J., concurring) ("The process of interpretation . . . involves . . . a determination of what the law is as handed down by the legislature . . . ."); *State v. Rasabout*, 2015 UT 72, ¶ 10, 356 P.3d 1258 ("[W]hen construing a statute, we seek to give effect to the intent of the Legislature."). Thus, we are not adding terms to the statute; we are merely interpreting what the legislature intended, and saying what the law as enacted by the legislature is. The plain meaning of extreme emotional distress leads us to conclude that the legislature intended the defendant to establish a reasonable explanation or excuse for the loss of self-control.

¶32 Requiring a reasonable explanation or excuse for the extreme emotional distress creates an objective inquiry, rather than a subjective one.[5] *See* UTAH CODE § 76-5-205.5(4) ("The reasonableness of an

---

[5] The Model Penal Code's extreme emotional distress defense replaced our common law heat of passion defense in 1973. In 1975, the

(Continued. . .)

explanation or excuse . . . shall be determined from the viewpoint of a reasonable person under the then existing circumstances."). The defendant must have a reasonable explanation or excuse for the extreme emotional distress, and the loss of self-control is included in the definition of extreme emotional distress. Thus, the loss of self-control must be measured from an objective, reasonable-person standard. *Supra* ¶ 15. We have not added any substantive terms to the statute; we have merely interpreted the statute according to its plain meaning in the context and purpose of the statute.

¶33 We hold that the defendant must establish, by a preponderance of the evidence, that his loss of self-control was reasonable and that the average person's reason would have been overcome by extremely unusual and overwhelming stress and extreme emotions.

¶34 The State asks us to go one step further and hold that the killing itself must be reasonable. We decline the State's invitation. While the State raises significant policy considerations, such an interpretation does not comport with the plain language of the statute. The statute requires a reasonable explanation or excuse only for the extreme emotional distress, not for any subsequent action taken by the defendant. *See* UTAH CODE § 76-5-205.5. While a loss of self-control is included in the definition of extreme emotional distress, it is too much of a stretch to include "killing" in that definition.

¶35 Additionally, it is hard to imagine that the average reasonable person would ever kill someone, except in limited circumstances such as self-defense or war. Indeed, once the average reasonable person in the then-existing circumstances loses self-control, the person no longer acts reasonably. The reasonable person becomes the unreasonable or irrational person because "that person's reason [is] overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation, or other similar emotions." *Bishop*, 753 P.2d at 471. Once the

_____

(Continued. . .)

legislature removed the requirement that the "reasonableness of [the] explanation or excuse" must be "determined from the viewpoint of a person in the actor's situation under the circumstances as he believes them to be," removing any subjective standard. *Compare* 1973 Utah Laws 608, *with* 1975 Utah Laws 148; *see also Bishop*, 753 P.2d at 470–71 ("[T]he legislature intended in 1975 to do away with the subjective aspect of [extreme emotional distress]. . . . [The] defendant's subjective mental state should be irrelevant in determining whether the explanation or excuse for the disturbance is reasonable.").

average reasonable person loses self-control, there could be a wide range of actions that the now unreasonable person might take, but the fact finder is not directed by the statute to evaluate the reasonableness of the action ultimately taken.

¶36 That being said, there is no binary, on-off switch for self-control. In general, a person does not have complete self-control until he reaches a certain level of stress and emotion, and then loses it entirely. Rather, the average person's ability to exercise self-control is measured along a scale. "The phrase 'loss of self-control' . . . . is misleading," because extreme emotional distress "interferes with, but does not completely destroy, an actor's capacity to control conduct." Mitchell N. Berman & Ian P. Farrell, *Provocation Manslaughter As Partial Justification and Partial Excuse*, 52 WM. & MARY L. REV. 1027, 1048 (2011). Extreme emotions make us "less *able* to respond in a legally and morally appropriate fashion." Joshua Dressler, *Rethinking Heat of Passion: A Defense in Search of a Rationale*, 73 J. CRIM. L. & CRIMINOLOGY 421, 464 (1982). For instance, the average reasonable person's self-control may be impaired to the point where he might be expected to scream an obscenity at another driver during rush hour, but the average reasonable person's self-control in that situation would not be so degraded as to cause him to assault or kill the other driver absent some "extremely unusual and overwhelming stress," that is not typically found in rush hour traffic. *Bishop*, 753 P.2d at 471.

¶37 The amount of self-control a person exercises is tied to a variety of factors,[6] but the legislature has allowed fact finders to

---

[6] Recent research into self-control indicates that

an individual's self-control is a finite resource that can be used up by other cognitive demands and, furthermore, that an individual can get better at self-control over time. This work has compared the seeming paradox of self-control to a muscle--that is, self-control grows weaker with use in the short term but stronger with use in the long term.

Rebecca Hollander-Blumoff, *Crime, Punishment, and the Psychology of Self-Control*, 61 EMORY L.J. 501, 504 (2012). Additionally, "research has suggested that it is not only self-control tasks, per se, that deplete self-regulatory strength. Engaging in conscious choices, engaging in self-control over one's emotional responses, undergoing stressful experiences, and being reminded of one's mortality produced similar diminution in research subjects' performance at other self-control

(Continued. . .)

consider only the amount and type of stress the defendant was faced with and the "building emotional reaction" that the average reasonable person would experience in light of that stress. *White*, 2011 UT 21, ¶ 32. Thus, fact finders must determine at what point the average reasonable person's self-control and ability to think rationally would be so overwhelmed by stress and emotions that special mitigation by extreme emotional distress is established.

¶38 The reasonableness of the explanation or excuse for the defendant's loss of self-control must be read in the context of the statute, *Rasabout*, 2015 UT 72, ¶ 10, which reduces the convicted offense from aggravated murder to murder, or murder to manslaughter,[7] UTAH CODE § 76-5-205.5(5)(b). The statute does not mitigate assault or any other criminal activity. Additionally, the statute requires the defendant to establish that a reasonable person would suffer from *extreme* emotional distress. The fact that the defendant must establish *extreme* emotional distress in the context of murder indicates a legislative intent that it must be shown that the average reasonable person would experience an overwhelming and substantial loss of self-control.

¶39 The purpose behind special mitigation by extreme emotional distress confirms this holding. As we stated in *White*, most "intentional homicides . . . [are] the result of strong emotions and stresses. Consequently, a distinction must be drawn so that this defense will only be applicable to those homicides which appropriately qualify under the underlying purpose of this mitigating defense." 2011 UT 21, ¶ 22 (citation omitted). Special mitigation by extreme emotional distress is an "'indulgence of the frailty of human nature,' recognizing that the [stress and emotions] in some cases may be so great as to warrant a penalty less than that prescribed for murder." *State v. Ross*, 501 P.2d 632, 635 (Utah 1972) (citations omitted). But this legislative indulgence goes only so far. It has not been extended to reduce murder to manslaughter simply because the average reasonable person might experience stress and anger in the circumstances, and consequently a heightened impairment to his decision making process and self-control. Rather, a reasonable person's self-control and ability to make a rational choice must be overwhelmingly and substantially undermined.

---

(Continued. . .)

tasks." *Id*. at 539–540. In particular, "emotional distress is itself often a drain" on a person's self-control. *Id*. at 540 (citation omitted).

[7] The statute also allows for mitigation of attempted aggravated murder or attempted murder.

Berman, *supra* ¶ 36, at 1048 (Extreme emotional distress "is a partial excuse because the actor's choice-making capacities are so substantially undermined that it would be unfair to treat the actor as fully blameworthy . . . .").

¶40 The defendant must prove that the type and amount of stress would cause the average reasonable person's rationality to be overwhelmingly and substantially "overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation, or other similar emotions." *Bishop*, 753 P.2d at 471. While the average reasonable person may experience anger or other emotions in the face of large amounts of stress, the stress and emotion must be extreme, indicating that the connected impaired reasoning and loss of self-control must be overwhelming and substantial.

## III. THE JURY INSTRUCTIONS WERE LEGALLY SUFFICIENT

¶41 When reviewing jury instructions, "we look at the jury instructions 'in their entirety and will affirm when the instructions taken as a whole fairly instruct the jury on the law applicable to the case.'" *State v. Maestas*, 2012 UT 46, ¶ 148, 299 P.3d 892 (citation omitted). "Thus, a trial court does not err by refusing a proposed instruction 'if the point is properly covered in other instructions.'" *Id.* (citation omitted).

¶42 Seven instructions relating to extreme emotional distress were presented to the jury in this case. Mr. Lambdin challenges only three of them: jury instructions 19, 20, and 21. Jury instruction 20 states,

> Although a building emotional reaction to a series of events may contribute to extreme emotional distress, an external triggering event is also required. However, the triggering event need not be contemporaneous with *the Defendant's loss of self-control*.

(Emphasis added).

¶43 Mr. Lambdin argues that this instruction implies that the defendant's loss of self-control must be reasonable by conflating the extreme emotional reaction and the loss of self-control. As the defendant must establish that the loss of self-control was reasonable, there is no deficiency with this instruction.

¶44 Jury instruction 19 states,

> Criminal homicide constitutes manslaughter if the defendant commits murder, but Special Mitigation is established. Special Mitigation generally involves a factor or set of factors that make a person less blameworthy for a criminal act. Special Mitigation exist[s] when a person

15

> causes the death of another under the influence of extreme emotional distress for which there was a reasonable explanation or excuse. In this case, the defendant asserts that Special Mitigation exists because he caused the death of another under the influence of extreme emotional distress for which there was a reasonable explanation or excuse.
>
> A person acts under the influence of extreme emotional distress when he is exposed to extremely unusual and overwhelming stress that would cause the average reasonable person in similar circumstances to experience a loss of self-control and be overborne by intense feelings such as passion, anger, distress, grief, excessive agitation, or other like emotions. *The standard is not whether the defendant subjectively thought his reaction was reasonable. Rather, it is an objective standard, determined from the viewpoint of a reasonable person faced with the then-existing circumstances.*

(Emphasis added). Mr. Lambdin concedes that the first half of jury instruction 19 is an accurate depiction of the law. He argues that the emphasized portion of this instruction could confuse a jury into thinking that the reaction that must be reasonable is the act of killing itself, rather than the emotional reaction or the loss of self-control. While the instruction does not explicitly state that the reaction referred to is the emotional reaction and loss of self-control, only emotional reactions and loss of self-control are referenced in the entire paragraph in question. The dissent attempts to read not merely this instruction, but rather one sentence of this instruction in isolation. The sentence referencing the defendant's "reaction" is clearly tied to the preceding sentence, which discusses the defendant's loss of self-control in the face of "unusual and overwhelming stress." Thus, the meaning of "reaction" in the penultimate sentence seems quite clear.

¶45 Additionally, the "reaction" meant by instruction 19 was clarified by instruction 21, which provides,

> In examining the reasonableness of the explanation or excuse offered by the defendant you should consider all the then-existing circumstances. "Then-existing circumstances" include more than just the triggering event. The phrase refers to the broader context of past experiences and emotions that give *meaning to the defendant's reaction*, that is to say, to *the defendant's loss of self control*."

16

(Emphasis added). As the emphasized portion of this instruction clarifies, the reaction that the jury must conclude was reasonable, given the then-existing circumstances, is the loss of self-control, not the killing.

¶46 The dissent does not agree that instruction 21 clarifies the reaction referenced in instruction 19. They reason that instruction 19 is ambiguous as to what "reaction" it is referencing, saying that "it is certainly possible, and perhaps even likely, that a juror would understand *reaction* to mean not the loss of self-control, but the killing itself." *Infra* ¶ 59. While instruction 19 does not specifically mention that the reaction is the loss of self-control, it also does not specifically state that the reaction is the killing. Even if the dissent is correct and instruction 19 is ambiguous, something more than a possibility that a jury could be confused by an instruction is required to grant a new trial. *State v. Brooks*, 638 P.2d 537, 542 (Utah 1981) ("[T]he fact that one or more of the instructions, standing alone, are not as full or accurate as they might have been is not reversible error.").[8]

¶47 An in depth reading of almost any set of jury instructions in a complex case is likely to turn up some ambiguity in an individual instruction. If pointing to an ambiguity in an individual instruction

---

[8] To be granted a new trial, other courts require more than just a showing that an instruction is ambiguous and that it could have possibly confused the jurors. *See, e.g., Boyde v. California*, 494 U.S. 370, 380 (1990) (holding that an "ambiguous" jury instruction is insufficient only if "there is a reasonable likelihood that the jury has applied the challenged instruction" incorrectly); *State v. Sivo*, 925 A.2d 901, 913 (R.I. 2007) ("[A]n erroneous charge warrants reversal only if it can be shown that the jury 'could have been misled' to the resultant prejudice of the complaining party." (citations omitted)); *State v. Mann*, 394 P.3d 79, 83 (Idaho 2017) ("Reversible error occurs if an instruction misleads the jury or prejudices a party." (citation omitted)); *State v. Daniel W. E.*, 142 A.3d 265, 275 (Conn. 2016) (stating that "we examine the [trial] court's entire charge to determine whether it is reasonably [probable] that the jury could have been misled" (alterations in original) (citation omitted)); *State v. Lackman*, 395 P.3d 477, 480 (Mont. 2017) ("[R]eversible error occurs only if the instructions prejudicially affect a defendant's substantial rights."); *People v. Tyler*, 47 N.Y.S.3d 187, 189 (N.Y. App. Div. 2017) ("Reversal is appropriate . . . when the charge, 'read . . . as a whole . . .' likely confused the jury regarding the correct rules to be applied in arriving at a decision." (second alteration in original) (citation omitted)).

were enough, almost no set of instructions would survive. Individual instructions must be viewed along a spectrum. When an instruction completely misstates a legal standard, there is little chance that other instructions, read as a whole, will remedy the juror confusion that is likely to ensue. That did not happen here. Instruction 19 simply left out a specific reference to the "reaction" it was referencing. When an instruction is simply ambiguous, other instructions may have a greater impact on the jury's understanding. Instruction 21 more than adequately addresses any juror confusion that could have arisen under instruction 19.[9] Unless the instructions, read as a whole, create a reasonable likelihood that the jurors were misled or confused as to the correct legal standard, a new trial is not appropriate.[10] Nothing in instruction 19, when read in conjunction with instruction 21, creates such a reasonable likelihood.

¶48 Additionally, defense counsel's closing argument clarified this for the jury. Defense counsel stated that,

> [The instructions are] instructing you [the jury] to look toward the meaning and the reasons for the defendant's loss of self-control, and to assess the reasonableness of that, the loss of self-control, and not the killing. [The

---

[9] The dissent argues that "there is nothing in either instruction that would alert the jury that the *reaction* referred to in instruction 21 was the same *reaction* referred to in instruction 19," and therefore the "jurors were left on their own to connect the reaction in instruction 21 with the reaction in instruction 19." *Infra* ¶ 62. But instruction 19 discusses how a reasonable person would lose self-control under similar, stressful circumstances. It then goes on to mention the "reaction," clearly referencing the loss of self-control in the face of the overwhelming stress. Instruction 21 discusses the "reaction," meaning "the defendant's loss of self control." It is difficult to see how a reasonable juror would not make this connection, given that there is only one "reaction" discussed in this portion of the jury instructions, and both are surrounded by discussions of the loss of self-control.

[10] The dissent argues that requiring a defendant to show a reasonable likelihood that the jury was misled or confused "sets a dangerously high standard." *Infra* ¶ 65. On the contrary, our standard appears to comport with those applied in other jurisdictions. *See supra* ¶ 46 n.8.

18

instructions are] not asking you to find that a reasonable person would absolutely have committed this killing, but that a reasonable person would have experienced a loss of self-control. And some people would do different things when they lose self-control . . . . So what you are looking to is the defendant's loss of self-control and the explanation for that and the reasonableness of that, and not trying to get to the point of saying, oh, yes, a killing is reasonable, because, of course, a killing is never reasonable.

The language of the instruction and of defense counsel's arguments make it abundantly clear that the loss of self-control is what must be reasonable, not the murder.

¶49 We note that the distinction between a reasonable loss of self-control and a reasonable murder is not easily made. In this case, the district court rejected defendant's proposed jury instruction that made it clear that the killing need not be reasonable. While the jury instructions adopted by the district court here were legally sufficient, we note that defendant's proposed instruction was also proper and the best practice would be to provide explicit instructions to juries to inform them of this nuanced distinction. We provide the following language as an example:

> The defendant needs to prove only that an average reasonable person would have an extreme emotional reaction to the stress and that the same average reasonable person would experience an overwhelming and substantial loss of self-control in light of the stress and the emotional reaction. The defendant does not need to prove that the killing was reasonable because once a reasonable person has lost self-control, he is no longer acting reasonably.

¶50 While we provide this language as an example, we note that jury instructions cannot be viewed in isolation. Rather, they must be read together as a whole to determine if the jury has been adequately instructed on special mitigation by extreme emotional distress. *See Maestas*, 2012 UT 46, ¶ 148.

¶51 This instruction alone does not guarantee that the jury instructions, taken as a whole, are accurate. It is provided only to assist trial courts with crafting or adopting an instruction that adequately informs the jury that the defendant must prove he has a reasonable explanation or excuse for the emotional reaction and loss of self-control, but not for the subsequent killing.

¶52 Jury instructions explaining the "reasonable explanation or excuse" requirement should avoid ambiguity as to what the reasonable explanation is addressing. If one instruction strongly implies the killing must be reasonable, this additional jury instruction may not be sufficient to remedy the misstatement. *State v. Campos*, 2013 UT App 213, ¶ 64, 309 P.3d 1160 ("[W]here instructions are in irreconcilable conflict, or so conflicting as to confuse or mislead the jury, the rule requiring instructions to be read together [as a whole] has no application." (citation omitted)).

¶53 Finally, because the jury instructions in this case are legally sufficient and accurately describe the law, we do not address Mr. Lambdin's arguments for prejudice.

## CONCLUSION

¶54 We hold that a criminal defendant who seeks to establish special mitigation by extreme emotional distress must prove that his loss of self-control is reasonable. Based on this, we hold that the jury instructions in this case were an adequate depiction of the law. We affirm the court of appeals.

———————————

CHIEF JUSTICE DURRANT, dissenting:

¶55 I respectfully dissent from the majority's conclusion that the jury instructions in this case were legally sufficient. Even when examined "in their entirety," they failed to accurately "instruct the jury on the law applicable to the case."[1] Specifically, jury instruction 19 introduced an ambiguity that was not remedied by later instructions or by closing arguments.

¶56 A criminal defendant "is entitled to have the jury instructed *fully and clearly* on the law" that supports his theory of the case.[2] And while we have held that a misleading or erroneous jury instruction is harmless if "we are not convinced that without this instruction the jury would have reached a different result,"[3] that is not the case here. The ambiguity in jury instruction 19 "create[d] a reasonable likelihood that the jurors were misled or confused as to the correct legal standard,"[4] even when the jury instructions are read as a whole. The defendant confessed to killing the victim. The only issue for the jury to decide was whether special mitigation applied. Jury instruction 19, explaining the special mitigation of extreme emotional distress, went to the very heart of the defendant's theory of the case. Without a full and clear statement of the law of special mitigation by extreme emotional distress, there is an obvious risk that the jury reached its verdict based on a misunderstanding of the law.

¶57 Jury instruction 19 stated as follows:

> Criminal homicide constitutes manslaughter if the defendant commits murder, but Special Mitigation is established. Special Mitigation generally involves a factor or set of factors that make a person less blameworthy for a criminal act. Special Mitigation exist[s] when a person causes the death of another under the influence of extreme emotional distress for which there was a reasonable explanation or excuse. In this case, the defendant asserts that Special Mitigation exists

---

[1] *State v. Maestas*, 2012 UT 46, ¶ 148, 299 P.3d 892 (citation omitted).

[2] *State v. Castillo*, 457 P.2d 618, 620 (Utah 1969) (emphasis added); *see also State v. Harding*, 635 P.2d 33, 34 (Utah 1981) (extending *Castillo*'s analysis of jury instructions on the theory of self-defense to other defense theories).

[3] *Green v. Louder*, 2001 UT 62, ¶ 17, 29 P.3d 638.

[4] *Supra* ¶ 47.

because he caused the death of another under the influence of extreme emotional distress for which there was a reasonable explanation or excuse.

A person acts under the influence of extreme emotional distress when he is exposed to extremely unusual and overwhelming stress that would cause the average reasonable person in similar circumstances to experience a loss of self-control and be overborne by intense feelings such as passion, anger, distress, grief, excessive agitation, or other like emotions. The standard is not whether the defendant subjectively thought *his reaction* was reasonable. Rather, it is an objective standard, determined from the viewpoint of a reasonable person faced with the then-existing circumstances.

(Emphasis added.) The first paragraph of instruction 19 accurately depicts the law. It tracks the special mitigation statute, which provides that in order for special mitigation to apply, the actor must "cause[] the death of another . . . under the influence of extreme emotional distress for which there is a reasonable explanation or excuse."[5]

¶58 The second paragraph also begins with an accurate statement of the law, employing the definition of extreme emotion distress this court adopted in *State v. Bishop*.[6] But the final two sentences introduce a significant ambiguity. After setting forth our *Bishop* definition ("[a] person acts under the influence of extreme emotional distress when he is exposed to extremely unusual and overwhelming stress that would cause the average reasonable person in similar circumstances to experience a loss of self-control and be overborne by intense feelings"), the instruction goes on to state that "[t]he standard is not whether the defendant subjectively thought *his reaction was reasonable.* Rather, it is an objective standard, determined from the viewpoint of a reasonable

---

[5] UTAH CODE § 76-5-205.5(1).

[6] 753 P.2d 439 (Utah 1988), *overruled on other grounds by State v. Menzies*, 889 P.2d 393 (Utah 1994). "In *Bishop*, . . . [w]e stated that a person acts under the influence of extreme emotional distress when 'he is exposed to extremely unusual and overwhelming stress' that would cause the average reasonable person under the same circumstances to 'experience a loss of self-control,' and 'be overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation, or other similar emotions.'" *State v. White*, 2011 UT 21, ¶ 26, 251 P.3d 820 (quoting *Bishop*, 753 P.2d at 471 ).

person faced with the then-existing circumstances." (Emphasis added). The jury is left to answer the question of what the relevant reaction was. Because this instruction did not fully and clearly define what is meant by *reaction*, the jury could conclude that the reaction was not the loss of self-control, but the act of killing.

¶59 The majority reasons that although "the instruction does not explicitly state that the reaction referred to is the emotional reaction and loss of self-control," the meaning of *reaction* "seems quite clear" because "only emotional reactions and loss of self-control are referenced in the entire paragraph in question."[7] But the meaning of *reaction* is anything but clear. In fact, the "usual and ordinary meanings" of *reaction*—which the jury was instructed to employ[8]—include "a response to some treatment, situation, or stimulus" and a "bodily response to or activity aroused by stimulus."[9] So it is certainly possible, and perhaps even likely, that a juror would understand *reaction* to mean not the loss of self-control, but the killing itself.

¶60 This ambiguity is accentuated by its placement relative to the definition of extreme emotional distress. The majority states that "[t]he sentence referencing the defendant's 'reaction' is clearly tied to the preceding sentence,"[10] but there is no transition or other language that clearly ties these sentences together. There is no reference in either sentence that would indicate that *reaction* is the defendant's loss of self-control. The reference to *his reaction* follows the definition of extreme emotional distress. The progression of the events listed in the paragraph—from extreme emotional distress to the loss of self-control to the reaction—suggests that the *reaction* referred to is the culmination of that sequence of events, which was the murder. So a juror could easily interpret *his reaction* to refer to the defendant's reaction to the extreme emotional distress—specifically, the act of killing his wife.

¶61 The majority argues that instruction 19 is not ambiguous, but it still attempts to shore up the meaning of *reaction* by pointing to another

---

[7] *Supra* ¶ 44.

[8] Jury instruction 14 stated, "Unless these instructions give a definition, you should give all words their usual and ordinary meanings." Jury instructions 29 and 30 defined terms relevant to the case, but did not define *reaction*.

[9] Reaction, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/reaction (last visited July 20, 2017).

[10] *Supra* ¶ 44.

jury instruction, instruction 21, and to defense counsel's closing argument. Neither instruction 21 nor the closing arguments was sufficient to cure instruction 19's ambiguity.

¶62 Jury instruction 21 explained, "In examining the reasonableness of the explanation or excuse offered by the defendant you should consider all the then-existing circumstances. 'Then-existing circumstances' include more than just the triggering event. The phrase refers to the broader context of past experiences and emotions that give meaning to the defendant's reaction, that is to say, to the defendant's loss of self-control." The majority concludes that "this instruction clarifies" that "the reaction that the jury must conclude was reasonable . . . is the loss of self-control, not the killing."[11] But instruction 21 is explicitly addressed to "the reasonableness of the *explanation or excuse*," not the reasonableness of the *reaction*. (Emphasis added). So the jurors were left on their own to connect the reaction in instruction 21 with the reaction in instruction 19. Moreover, there is nothing in either instruction that would alert the jury that the *reaction* referred to in instruction 21 was the same *reaction* referred to in instruction 19. As the majority states, "[j]ury instructions explaining the 'reasonable explanation or excuse' requirement should avoid ambiguity as to what the reasonable explanation is addressing. If one instruction strongly implies the killing must be reasonable, this additional jury instruction may not be sufficient to remedy the misstatement."[12] Instruction 21 falls well short of clarifying the ambiguity in instruction 19.

¶63 Finally, the majority reasons that defense counsel's closing argument was sufficient to clarify instruction 19. It is true that defense counsel correctly stated the law, but she did so without using the ambiguous term *reaction*. And I find it troubling to conclude that defense counsel's closing argument could cure an ambiguous instruction where jurors were specifically instructed to rely on the jury instructions and not the closing arguments for statements of law.[13]

---

[11] *Supra* ¶ 45.

[12] *Supra* ¶ 52.

[13] Instruction 3 read, "When the lawyers give their closing arguments, keep in mind that they are advocating their views of the case. What they say during their closing arguments is not evidence. If the lawyers say anything about the evidence that conflicts with what you remember, you are to rely on your memory of the evidence. If they say anything about the law that conflicts with these instructions, you are to rely on these instructions."

¶64 Moreover, even accepting the proposition that closing arguments could clarify an ambiguous jury instruction as a general matter, they did not do so in this case. Here, while the jury did hear a correct description of the law by defense counsel, it also heard an incorrect description by the prosecutor in his rebuttal. There, the prosecutor conflated the loss of control with the killing. He first referenced "a complete loss of control that results in stabbing [one's] spouse and beating them." He then defined the loss of control in this case as "the stabbing and the beating." So the last statement of the law the jury heard before it deliberated was a conflation of the loss of self-control and the killing, which emphasized the ambiguous use of *his reaction* in instruction 19. The majority provides no explanation for why the jury would have relied upon defense counsel's closing argument, while disregarding the prosecutor's rebuttal.

¶65 The majority states that "[e]ven if . . . instruction 19 is ambiguous, something more than a possibility that a jury could be confused by an instruction is required to grant a new trial."[14] The majority sets a dangerously high standard. While it is true that "almost any set of jury instructions" will contain some ambiguity, an ambiguous jury instruction that significantly distorts a legal standard is on par with a jury instruction that "completely misstates a legal standard."[15] And that is what we have here. Instruction 19 did not "simply [leave] out a specific reference to the 'reaction' it was referencing," as the majority states.[16] It all but invited an incorrect application of the law by the jury—that it must find the killing itself reasonable and not simply the loss of self-control.

¶66 The majority correctly observes that "the distinction between a reasonable loss of self-control and a reasonable murder is not easily made."[17] While this distinction is not *easily* made, it must be *clearly* made because for a defendant to prove that a murder was reasonable is an altogether different task than proving that a loss of control was reasonable. The majority agrees with this, highlighting the important difference between the loss of self-control and murder. After rejecting the State's argument that the killing itself must be reasonable, the majority concludes that "it is hard to imagine that the average reasonable person would ever kill someone . . . . Indeed, once the

---

[14] *Supra* ¶ 46.

[15] *Supra* ¶ 47.

[16] *Supra* ¶ 47.

[17] *Supra* ¶ 49.

average reasonable person in the then existing circumstances loses self-control, the person no longer acts reasonably."[18] To require proof that a murder was reasonable would effectively eliminate the defense of special mitigation by extreme emotional distress. Indeed, it seems highly unlikely that any jury would ever conclude that a murder was reasonable.

¶67 Yet, instruction 19's ambiguous reference to *his reaction* created a very real possibility that the jury believed its charge was to determine whether the murder was reasonable. The defendant was entitled to a clear instruction on special mitigation by extreme emotional distress— in fact, he proposed one that was rejected by the court. This instruction went to the heart of his theory of the case. Even though he committed a horrific act, he is nevertheless entitled to a fair trial, which includes a clear instruction on this key element of his defense. Because a clear instruction was lacking here, I would reverse.

---

[18] *Supra* ¶ 35.