*This opinion is subject to revision before final
publication in the Pacific Reporter*
**2018 UT 31**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Respondent and Cross-petitioner,*

*v.*

JAMES RAPHAEL SANCHEZ,
*Petitioner and Cross-respondent.*

No. 20160891
Filed July 5, 2018

On Certiorari to the Utah Court of Appeals

Third District, Salt Lake
The Honorable Denise P. Lindberg
No. 111903659

Attorneys:

Sean D. Reyes, Att'y Gen., Karen A. Klucznik, Asst. Solic. Gen.,
Salt Lake City, for respondent and cross-petitioner

Teresa L. Welch, Ralph W. Dellapiana, Salt Lake City, for
petitioner and cross-respondent

JUSTICE HIMONAS authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE PEARCE, and JUSTICE PETERSEN joined.

JUSTICE HIMONAS, opinion of the Court:

## INTRODUCTION

¶1 For more than seven hours, James Sanchez viciously tortured his girlfriend, ultimately causing her death. Mr. Sanchez contends that he was under extreme emotional distress at the time because the victim allegedly told him that she was cheating on him with his brother and refused to promise she would stop. If proven, Mr. Sanchez's extreme emotional distress would be a special mitigating factor reducing the level of offense from

criminal homicide to manslaughter. At trial, the court excluded statements Mr. Sanchez made to a detective that he contends would have supported his claim for a reduced charge based on special mitigation for extreme emotional distress. He was convicted of first-degree murder by a jury.

¶2   On appeal, the court of appeals determined that the trial court abused its discretion by not admitting the statements under Utah Rule of Evidence 106.[1] Nevertheless, the court of appeals found that the error was harmless because, even if the statements were admitted, Mr. Sanchez would not have met his burden of proving extreme emotional distress mitigation. *See State v. Sanchez*, 2016 UT App 189, ¶¶ 43–46, 380 P.3d 375. Mr. Sanchez petitioned for a writ of certiorari of the harmless error determination, and the state filed a cross petition on the rule 106 determination. We granted certiorari review on both Mr. Sanchez's petition and the state's cross petition.

¶3   Typically, when an appellate court reviews an alleged error in the trial court's determinations on the rules of evidence, we first look to see if there was error under the appropriate standard of review. Next, if error is found, we determine if the "error is so prejudicial and so substantial that, absent the error, it is reasonably probable that the result would have been more favorable for the defendant." *State v. Thomas*, 1999 UT 2, ¶ 26, 974 P.2d 269. Nevertheless, in this case, we decline the invitation of the state to decide whether the testimony should have been admitted under rule 106 because, like the court of appeals, we find that if in fact the court erred in not admitting the evidence, the error would be harmless. Additionally, we note that the court of appeals used the incorrect standard for measuring extreme emotional distress. Therefore, we vacate the portions of the court of appeals' decision that deal with rule 106 and the standard for extreme emotional distress, we clarify the correct standard for extreme emotional distress, and we affirm the court of appeals' harmlessness determination on alternative grounds.

---

[1] Utah Rule of Evidence 106 provides that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time."

## BACKGROUND

¶4    The victim in this case was killed by her boyfriend in her apartment on May 5, 2011, after a prolonged period of brutalization. The events that led to her death began the previous night when Mr. Sanchez claims she told him that she was cheating on him with his brother.[2] Mr. Sanchez's initial reaction was to pull her hair. However, over the course of the next seven to ten hours, Mr. Sanchez engaged in a brutal attack on the victim. Mr. Sanchez admitted to detectives that over the course of the night he repeatedly pulled the victim's hair, slapped her, kicked her, choked her, used the heel of his foot to stomp on her, bit her, and grabbed her stomach and clenched hard enough to leave bruises. Mr. Sanchez also grabbed the victim's lips and pulled them so hard that they tore away from her mouth and backhanded her hard enough to cause her nose to bleed uncontrollably.

¶5    At several points throughout the night, Mr. Sanchez choked the victim to the point of losing consciousness. When she lost consciousness, Mr. Sanchez would sometimes attempt to

---

[2] While defense counsel emphasized the victim's "sexual relations" with Mr. Sanchez's brother in his opening statement, he was unable to put any evidence on this point before the jury. And on an appeal from a jury verdict, we would ordinarily not consider this material as we "review the record facts in a light most favorable to the . . . verdict and recite the facts accordingly." *State v. Goins*, 2017 UT 61, n.1, ---P.3d--- (citation omitted). But where "necessary to understand issues raised on appeal," as here, we also "present conflicting evidence." *Id.* (citation omitted). Indeed, as a matter of logic, harmlessness inquiries, like the one we confront in this matter, will often present the type of setting in which the review and presentation of conflicting evidence is necessary. *See United States v. Gonzalez-Gonzalez*, 136 F.3d 6, 7–8 (1st Cir. 1998) ("Because this appeal involves admittedly improper remarks by the prosecutor, and because the verdict could have been tainted by these remarks, we do not consider the facts in the light most favorable to the jury's verdict. Our description of the facts is designed to provide a balanced picture of the evidence appropriate for determining whether the remarks were harmless or prejudicial." (citation omitted) (internal quotation marks omitted)).

revive her through resuscitation. At another point that night, Mr. Sanchez took the victim to the bathroom and ran water over her head in an attempt to "fully arouse her or awaken her" and to clean her up because "she was bleeding profusely from her face." He also tried to clean the victim up using hydrogen peroxide.

¶6 The victim's downstairs neighbors could hear portions of the attack. One downstairs neighbor testified that she could hear crying from at least one to six a.m., with quiet periods lasting no longer than five minutes. In the middle of the night, that neighbor said that she could "hear[] a lot of crying, more so like despair, and then . . . excessive like crying, and . . . muffled yelling or grunting." The neighbor became so concerned by the noises that she asked her mother to call the police. The mother went upstairs several times and knocked on the victim's door and tried to call the victim's phone. When the victim did not answer the door or the phone, the mother finally called 9-1-1. Police arrived around 6:40 a.m. They knocked on the door several times, but nobody answered. Dispatch also tried calling phone numbers associated with the apartment, but they went unanswered. Police listened at the door for several minutes to see if they could hear noises coming from inside, but they could not hear anything. The call was cleared around seven a.m. Between 6:30 and 7:15 a.m., the downstairs neighbor did not hear any noises. And by the time she left for work at 8:15 a.m., the apartment above was silent.

¶7 Around eight or nine in the morning, Mr. Sanchez choked the victim for the final time. Mr. Sanchez, realizing that his first method of choking—a headlock—was not working, tried a second method—placing his elbow on her throat while on top of her. And then, when that method also proved ineffective, Mr. Sanchez turned to a third method—placing his forearm on her throat and leaning into her. This third method caused the victim to lose consciousness, which she never regained.

¶8 After the victim lost consciousness, Mr. Sanchez lay down next to her and took a nap. When he woke up one to two hours later, the victim was still unresponsive, so he called a friend to come and get him. When his friend arrived around twenty minutes later, Mr. Sanchez called 9-1-1 for an ambulance and then got in his friend's car and left. Police were able to track Mr. Sanchez to his friend's house a few hours later, and Mr. Sanchez eventually surrendered after taking several

methadone pills. Mr. Sanchez was taken to the hospital and later interviewed by Detective Chad Reyes.

¶9 At trial, Detective Reyes provided lengthy testimony about his interview with Mr. Sanchez. The trial court denied Mr. Sanchez's attempt to get additional statements he made to Detective Reyes admitted under rule 106 of the Utah Rules of Evidence. Mr. Sanchez appealed this decision to the court of appeals. The court of appeals held that the trial court should have admitted the evidence under rule 106, but that the error was harmless. *State v. Sanchez*, 2016 UT App 189, ¶ 46, 380 P.3d 375. Mr. Sanchez appealed the harmless error determination. The state cross-appealed the rule 106 decision. We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(a).

## STANDARD OF REVIEW

¶10 "On certiorari, we review the decision of the court of appeals for correctness, giving no deference to its conclusions of law." *State v. White*, 2011 UT 21, ¶ 14, 251 P.3d 820. "The correctness of the court of appeals' decision turns on whether that court correctly reviewed the trial court's decision under the appropriate standard of review." *State v. Dean*, 2004 UT 63, ¶ 7, 95 P.3d 276 (citation omitted). In reviewing the admissibility of evidence, "[w]e review the legal questions to make the determination of admissibility for correctness[;] . . . [w]e review the questions of fact for clear error[;] . . . [and w]e review the district court's ruling on admissibility for abuse of discretion." *State v. Workman*, 2005 UT 66, ¶ 10, 122 P.3d 639 (citations omitted).

## ANALYSIS

¶11 This case presents us with three potential issues for review. The court of appeals concluded that the trial court erred in not admitting Mr. Sanchez's proffered statements under rule 106 of the Utah Rules of Evidence but determined that the error was harmless. Mr. Sanchez sought certiorari review of this decision, arguing that the court of appeals erred (1) by using the incorrect harmlessness standard and (2) in its construction and application of the extreme emotional distress special mitigation statute. The state cross petitioned, arguing that the court of appeals was incorrect in holding that rule 106 required admission of statements that would otherwise constitute self-serving, inadmissible hearsay.

¶12 Although we granted the state's cross petition as a separate issue for our review, it functions as an alternative ground for us to affirm the court of appeals. Since we determine that if error existed, it was harmless, we first provide some discussion as to whether rule 106 would apply to the proffered statements, but we decline to reach the issue, proceeding to the prejudice prong. We do so because, even under the assumption that the trial court erred, the court of appeals used the correct prejudice standard in finding any potential error harmless and reached the correct result. Finally, we discuss and apply the correct standard for the extreme emotional defense mitigation and conclude that any error was harmless.

## I. ADMISSIBILITY OF DEFENDANT'S STATEMENTS TO DETECTIVE REYES UNDER RULE 106

¶13  The first issue we consider is whether the court of appeals was correct in concluding that Mr. Sanchez's statements to Detective Reyes should have been admitted under Utah Rule of Evidence 106. We begin by discussing the relevant trial court testimony and the lower court rulings. After that, we discuss the threshold questions necessary to determine whether rule 106 applies. The parties did not brief these threshold questions. And we decline to render an opinion where the parties have not "provide[d] reasoned argument and [valid] legal authority." *A.S. v. R.S.*, 2017 UT 77, ¶ 16, 416 P.3d 465 (second alteration in original) (citation omitted). Further, because we determine that any error in not admitting the evidence under rule 106 would be harmless, we do not need to determine if there was error.

*A. Trial Testimony and Lower Court Rulings*

¶14 At trial, Detective Reyes provided lengthy testimony regarding his interview with Mr. Sanchez. Relevant to the rule 106 argument, Detective Reyes testified that Mr. Sanchez told him that the fight started the night before when "he got mad at her and he pulled her hair." Additionally, Detective Reyes asked Mr. Sanchez "specifically about the choking," and "if [the victim] was saying anything or reacting at all to him when he was choking her[,] and [Mr. Sanchez] said that she wasn't saying much[;] she was just screaming."

¶15 On cross-examination, Mr. Sanchez wanted to elicit testimony from Detective Reyes about statements Mr. Sanchez made during the interview where he claimed that the victim repeatedly told him that she was having an affair with his brother

and refused to say she would stop. Mr. Sanchez acknowledged that his statements to the detective were hearsay, not admissible under rule 801(d)(2) of the Utah Rules of Evidence,[3] but argued several theories for admissibility, including Utah Rule of Evidence 106. The trial court ruled that the proffered statements were not admissible under any of the theories Mr. Sanchez presented.

¶16 Before us, Mr. Sanchez has only presented the argument that his statements should have been admitted under rule 106 of the Utah Rules of Evidence. Rule 106 provides as follows: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." UTAH R. EVID. 106.

¶17 The trial court rejected Mr. Sanchez's rule 106 argument, concluding that fairness did not require admitting the statements because they were a self-serving, after-the-fact explanation, temporally unrelated to the inculpatory portions of the interview previously admitted.

¶18 A majority of the court of appeals concluded that rule 106 covers both timing and admissibility and that the trial court abused its discretion by not admitting the proffered portions of the testimony. *State v. Sanchez*, 2016 UT App 189, ¶¶ 18, 30–31, 380 P.3d 375. Nevertheless, the court of appeals affirmed, holding that the error was harmless. *Id.* ¶ 46. Mr. Sanchez filed a writ of certiorari on this determination, and the state cross petitioned, arguing that the court of appeals erred by (1) deciding rule 106 applied without first determining whether the introduced statements were misleading and (2) concluding that rule 106 can overcome other rules of evidence that prevent admissibility.

---

[3] As the court of appeals correctly noted, the trial court erred when it concluded that these statements were double hearsay. *See State v. Sanchez*, 2016 UT App 189, ¶¶ 20–21, 380 P.3d 375. While Mr. Sanchez's statements were hearsay, offered to prove the truth of the matter asserted—that the victim had in fact told him she was having an affair—the victim's statements were not hearsay because they would have been offered to show the statement's effect on the listener. *See Arnold v. Grigsby*, 2018 UT 14, ¶ 20, 417 P.3d 606 (citation omitted).

*B. Applicability of Rule 106*

¶19 Other jurisdictions are split on the question of whether rule 106 is solely a rule of timing or if it also overcomes other rules of evidence that preclude admissibility. *See State v. Jones*, 2015 UT 19, ¶ 41 n.56, 345 P.3d 1195 (comparing holdings in other jurisdictions (citations omitted)). We have yet to weigh in on this divisive issue. *Id.* ¶ 41.

¶20 However, before we reach the timing versus admissibility issue raised by the court of appeals, there is a threshold question that must be answered: Does the evidence to be admitted qualify as a writing or recorded statement under rule 106? *Id.* Neither party adequately addressed this threshold question either in their briefing or at oral argument. And, based on the record before us, we are unconvinced that we can properly answer the question in this matter.

¶21 We previously left open the question of whether "rule 106 applies to transcribed oral statements that are used extensively at trial but are not actually introduced into evidence." *Id.* Some courts have said that reading a writing or recorded statement into the record or directly quoting it on cross-examination is enough, while other courts require actual introduction of the evidence before rule 106 applies. *Id.* ¶ 41 n.55 (noting that "[c]ourts have not reached a uniform decision on whether rule 106 applies to statements that are not introduced into evidence" and comparing rules across jurisdictions (citations omitted)). It is not clear here that the prosecutor's use would even meet the lower bar. And we have certainly left open the question of whether rule 106 applies if transcribed oral statements are not used extensively at trial.

¶22 Neither party introduced the actual transcript of the detective's interview at trial, and the transcript does not appear in the record. From the record, it appears that Mr. Sanchez's counsel repeatedly quoted from the transcript during cross-examination of Detective Reyes. However, Mr. Sanchez cannot rely upon his own use of the transcript to trigger additional admissibility under rule 106. *See* UTAH R. EVID. 106 (allowing "an *adverse* party [to] require the introduction" of a writing or recorded statement when "a party introduces all or part of a writing or recorded statement" (emphasis added)). Instead, Mr. Sanchez may only rely upon rule 106 if the prosecution has introduced all or part of a writing or recorded statement.

¶23 While Detective Reyes testified extensively about his conversation with Mr. Sanchez at trial, mere testimony about a conversation that happened to also be recorded is insufficient to trigger rule 106. From the record, it is clear that Detective Reyes used the transcript on multiple occasions to refresh his recollection under rule 612 of the Utah Rules of Evidence. The prosecution's use of the transcript to refresh Detective Reyes's recollection at trial provided Mr. Sanchez with specific options of which he may take advantage. *See* UTAH R. EVID. 612(b) (providing the adverse party with options when a writing is used to refresh memory). But it is unclear from the record if the prosecution ever directly quoted from the transcript when questioning Detective Reyes or if Detective Reyes quoted directly from the transcript when responding to questions from the prosecution.

¶24 We need not reach the issues of whether rule 106 would apply to the prosecution's use of the transcript or require the admission of statements that would otherwise be inadmissible hearsay. Moreover, we decline to answer such an important question in a case where we have serious doubts about the threshold applicability of rule 106, especially given the importance of the question of whether rule 106 can defeat other rules of evidence that work against admissibility, such as the rules on hearsay.[4] It is unnecessary to decide these issues in this case because we conclude that any potential error was harmless.

¶25 Because of the importance of the issue and our decision not to reach the question in this case despite the State challenging the court of appeals' decision, we vacate the portion of the court of appeals decision on rule 106. *Cf. State ex rel. B.R. v. S.M.*, 2007 UT 82, ¶ 7, 171 P.3d 435 (vacating a court of appeals opinion to "remedy the parties' . . . concerns" raised to, but not addressed by, the supreme court).

## II. MR. SANCHEZ WAS NOT PREJUDICED BY THE EXCLUSION OF THE PROFFERED STATEMENTS

¶26 Next we consider whether the court of appeals was correct in holding that any error was harmless. This requires us to

---

[4] Rather than waiting for the appropriate case to weigh in on these issues, we believe it is prudent to refer them to our Advisory Committee on the Rules of Evidence.

engage in two separate inquiries. First, we must determine if the court of appeals applied the correct prejudice standard. Second, we must determine if the error was harmless under the correct standard.

¶27 We agree with the court of appeals that the regular harmless error standard applies in this case. Additionally, although the court of appeals incorrectly interpreted the applicable special mitigation standard when concluding the error was harmless, we reach the same conclusion as the court of appeals under the clarified standard we announced in *State v. Lambdin*, 2017 UT 46, ___P.3d___.

*A. The Court of Appeals Applied the Correct Prejudice Standard*

¶28 Mr. Sanchez argues that the trial court's error under rule 106 was a constitutional error because it deprived him of his constitutional right to present a complete defense. Therefore, Mr. Sanchez contends that the court of appeals erred by employing a harmless error prejudice standard instead of a constitutional error prejudice standard.

¶29 The court of appeals determined that Mr. Sanchez was not entitled to the constitutional error standard for two independent reasons. *State v. Sanchez*, 2016 UT App 189, ¶¶ 35–36, 380 P.3d 375. First, the court of appeals found that Mr. Sanchez failed to preserve his constitutional argument. *Id.* ¶ 35. Second, the court of appeals noted that "[Mr.] Sanchez has not demonstrated that the denial of the benefit of special mitigation constitutes a denial of his federal due process right to present a complete defense." *Id.* ¶ 36.

¶30 The court of appeals was correct in holding that Mr. Sanchez failed to preserve his constitutional argument, and therefore we do not need to consider the court of appeals' second grounds for denying a constitutional error standard. "[I]n order to preserve an issue for appeal the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue." *Brookside Mobile Home Park, Ltd. v. Peebles*, 2002 UT 48, ¶ 14, 48 P.3d 968 (citation omitted). To meet the preservation requirement, "the issue must be 'sufficiently raised to a "level of consciousness" before the trial court and must be supported by evidence or relevant legal authority.'" *State v. Dean*, 2004 UT 63, ¶ 13, 95 P.3d 276 (citation omitted). Mr. Sanchez failed to meet this requirement.

¶31 Mr. Sanchez points to two places in the record to demonstrate preservation. However, neither of these instances would be sufficient to raise a general argument regarding the constitutional right to present a complete defense, let alone raise such a constitutional argument that is specifically tied to the rule 106 holding. In the first instance, after the court rejected defense counsel's argument regarding rule 106 and hearsay and said, "[i]f he wants to take the stand and say it, then that's fine," defense counsel responded by saying, "[w]ell, tell you what, we can spend the rest of the afternoon with me cross[-]examining [the detective] on the record and send it up on appeal then, because that's the defense. That's our defense." In the second instance, defense counsel had set out four separate theories of admissibility (including rule 106) and then said, "Let me just throw in there— haven't really thought about this very much, sorry to say, but I think it goes to our right to present a defense, and this is our defense." Immediately afterward, the prosecutor asked the court and defense counsel to make sure that they all have the same list of arguments so that the prosecutor could respond. Neither the court nor the prosecutor mentioned the right to present a defense when recounting their lists, and defense counsel did not attempt to add it to the list.

¶32 Importantly, as the court of appeals correctly noted, "[Mr.] Sanchez attempts to elevate a single rule 106 violation, which affected the application of the special mitigation statute, to federal constitutional status." *Sanchez*, 2016 UT App 189, ¶ 34. But Mr. Sanchez has failed to show how his attempts at preservation would "have alerted the trial court that denying his rule 106 motion would deprive him of his 'due process right to present a complete defense.'" *Id.* ¶ 35. Neither of these passing mentions of a defense is sufficient to "raise[]" the issue "to a 'level of consciousness' before the trial court." *Dean*, 2004 UT 63, ¶ 13 (citation omitted). Nor did defense counsel support his arguments with any "evidence or relevant legal authority." *Id.* Therefore, Mr. Sanchez failed to preserve an argument that the trial court's 106 ruling constituted a constitutional error.

¶33 "[U]npreserved federal constitutional claims are not subject to a heightened review standard but are to be reviewed under our plain error doctrine." *State v. Bond*, 2015 UT 88, ¶ 44, 361 P.3d 104. Normally, we would review Mr. Sanchez's arguments for plain error. However, although Mr. Sanchez did not preserve his claim that the rule 106 decision would be

constitutional error, he still preserved his rule 106 argument. Therefore, we will review the rule 106 decision under a regular harmless error standard.

*B. Any Error in Excluding the Proffered Evidence Under Rule 106 Was Harmless*

¶34 Even under the assumption that Mr. Sanchez's statements to Detective Reyes should have been admitted under rule 106, we find any such error harmless. "In circumstances where evidence should have been admitted, it is reviewed for harmless error. If it is reasonably likely a different outcome would result with the introduction of the evidence and confidence in the verdict is undermined, then exclusion is harmful." *State v. Colwell*, 2000 UT 8, ¶ 26, 994 P.2d 177.

¶35 Prior to trial, Mr. Sanchez requested a jury instruction on the extreme emotional distress special mitigation statute. Because no evidence of extreme emotional distress was admitted at trial, Mr. Sanchez conceded that no jury instruction was warranted. However, assuming the proffered statements not admitted under rule 106 would have constituted sufficient evidence to warrant a jury instruction on extreme emotional distress, the issue would have gone to the jury to decide. Therefore, in determining the harmlessness of any error in not admitting the evidence under rule 106, we must decide whether it is reasonably likely that the jury would have found that Mr. Sanchez proved extreme emotional distress sufficient to meet the special mitigation statute.

¶36 Special mitigation requires showing that (1) the defendant was subjectively under extreme emotional distress and (2) there is an objectively reasonable explanation or excuse for the extreme emotional distress. *See infra* ¶ 38. The court of appeals determined that there was "no reasonable probability" that a jury would find extreme emotional distress. *Sanchez*, 2016 UT App 189, ¶ 45. However, the court of appeals reached its decision by misinterpreting the objective standard in *State v. White*, 2011 UT 21, 251 P.3d 820, which we subsequently clarified in *Lambdin*, 2017 UT 46. Although the court of appeals used the incorrect objective standard, we reach the same result under the subjective requirement of special mitigation. Based on the limited nature of the proffered evidence, combined with the evidence before the jury, we conclude that it is not reasonably likely that a jury would find that Mr. Sanchez had proved he was subjectively under the influence of extreme emotional distress when he committed the

murder. Because the court of appeals used the incorrect objective extreme emotional distress standard, we vacate that portion of the court of appeals' opinion.

1. Extreme Emotional Distress Standard

¶37 When the legislature originally enacted the extreme emotional distress statute, it "intended to 'substantially enlarge[] the class of cases' available in extreme emotional distress from the more narrow common law heat of passion defense." *Lambdin*, 2017 UT 46, ¶ 28 n.4 (alteration in original) (citation omitted). Since that time, the legislature has "changed [extreme emotional distress] from a defense to an affirmative defense and then changed it again to special mitigation and narrowed its scope . . . . ma[king] it more difficult to prove . . . but [leaving] the core provisions largely intact." *Id.*

¶38 The present special mitigation statute provides two main requirements: (1) subjectively, the defendant must be acting "under the influence of extreme emotional distress" at the time he causes or attempts to cause the death of another and (2) objectively, "there is a reasonable explanation or excuse" for the extreme emotional distress.[5] UTAH CODE § 76-5-205.5; *see also*

---

[5] The relevant portion of the statute provides:
> (1) Special mitigation exists when the actor causes the death of another or attempts to cause the death of another:
>
> . . .
>
> > (b) under the influence of extreme emotional distress for which there is a reasonable explanation or excuse.
>
> . . .
>
> (3) Under Subsection (1)(b), emotional distress does not include:
>
> > (a) a condition resulting from mental illness as defined in Section 76-2-305; or
> > (b) distress that is substantially caused by the defendant's own conduct.
>
> (4) The reasonableness of an explanation or excuse under Subsection (1)(b) shall be determined from the viewpoint of a reasonable person under the then existing circumstances.

*Lambdin*, 2017 UT 46, ¶ 32 ("Requiring a reasonable explanation or excuse for the extreme emotional distress creates an objective inquiry, rather than a subjective one."); *State v. Bishop*, 753 P.2d 439, 471 (Utah 1988) ("Utah's statute . . . has two principal elements: (1) the killing must be committed while under the influence of an extreme mental or emotional disturbance, and (2) there must be a reasonable explanation or excuse for the disturbance."), *overruled on other grounds by State v. Menzies*, 889 P.2d 393 (Utah 1994); *cf. Ross v. State*, 2012 UT 93, ¶ 28, 293 P.3d 345 (articulating a substantively identical test for a predecessor extreme emotional distress affirmative defense statute). The defendant is required to prove extreme emotional distress by a preponderance of the evidence. UTAH CODE § 76-5-205.5(5)(a).

¶39 We have previously stated that a person is suffering from extreme emotional distress:

> (1) when he has no mental illness as defined in section 76-2-305 (insanity or diminished capacity); and
>
> (2) when he is *exposed* to extremely unusual and overwhelming stress; and
>
> (3) when the average reasonable person under that stress would have an extreme emotional reaction to it, as a result of which he would experience a loss of self-control and that person's reason would be overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation, or other similar emotions.

*State v. Bishop*, 753 P.2d at 471.

¶40 Most of our case law, including our most recent decision in *Lambdin*, has focused on the objective portion of the test. We have repeatedly stated that a defendant's loss of self-control must be objectively reasonable. *See, e.g.*, *Lambdin*, 2017 UT 46, ¶ 32. But

---

> (5)(a) If the trier of fact finds . . . that the existence of special mitigation under this section is established by a preponderance of the evidence, it shall [apply the special mitigation required by the statute].

UTAH CODE § 76-5-205.5.

this requirement obviously contemplates that a defendant must have actually (i.e., subjectively) lost self-control.

¶41 Although we have never explicitly discussed the subjective requirement on its own, we have said that a defendant's loss of self-control must be contemporaneous with an extreme emotional reaction. *Id.* ¶ 30 ("[I]f the loss of self-control does not occur while the defendant is experiencing the extreme emotional reaction, then the loss of self-control is not caused by the extreme emotional reaction and special mitigation is not appropriate."). But an extreme emotional reaction and contemporaneous loss of self-control are not enough to show subjective extreme emotional distress on their own. Instead, it is necessary for a defendant to show that his or her extreme emotional reaction caused a loss of self-control *and* that his or her "reason [was] overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation, or other similar emotions." *Bishop*, 753 P.2d at 471. If a defendant has lost self-control but still can reason—hence, is not *overborne* by intense feelings—then the defendant is not acting under extreme emotional distress.

¶42 In *Lambdin*, we concluded that the "definition" of extreme emotional distress in *Bishop* was the "best formulation of what constitutes extreme emotional distress" for the current special mitigation statute. 2017 UT 46, ¶ 23. And this is true. However, the definition of extreme emotional distress in *Bishop* was adopted under a different statute that had slightly different requirements. For example, under the current special mitigation statute, "emotional distress does not include . . . distress that is substantially caused by the defendant's own conduct." UTAH CODE § 76-5-205.5(3). This requirement is not reflected in the *Bishop* definition. Nor is the subjective component compelled by statute and our case law. Therefore, we take this opportunity to clarify the requirements a defendant must meet to be entitled to special mitigation for extreme emotional distress.

¶43 As set forth above, for a defendant to be entitled to special mitigation under the statute: "(1) subjectively, the defendant must be acting 'under the influence of extreme emotional distress' at the time he causes or attempts to cause the death of another and (2) objectively, 'there is a reasonable explanation or excuse' for the extreme emotional distress." *Supra* ¶ 38 (citations omitted). A defendant can prove that he was

subjectively under the influence of extreme emotional distress by showing:

(1) he was "exposed to extremely unusual and overwhelming stress," *Lambdin*, 2017 UT 46, ¶ 15 (emphasis omitted) (citation omitted);

(2) he had "an extreme emotional reaction to it, as a result of which he . . . experience[d] a loss of self-control and [his] reason [was] overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation, or other similar emotions," *id.* (citation omitted);[6]

(3) his emotional distress was not "a condition resulting from mental illness as defined in Section 76-2-305," UTAH CODE § 76-5-205.5(3)(a); and

(4) his emotional distress was not "substantially caused by [his] own conduct," *id.* § 76-5-205.5(3)(b).

¶44 A defendant can prove there was an objectively reasonable explanation or excuse for his extreme emotional distress by showing that, "under the then existing circumstances," *id.* § 76-5-205.5(4), "the average reasonable person under [the "extremely unusual and overwhelming"] stress [to which the

---

[6] Previously, we have only discussed this prong in the *objective* setting, recognizing extreme emotional distress exists "*when the average reasonable person under that stress* would have an extreme emotional reaction to it." *Lambdin*, 2017 UT 46, ¶ 15 (emphasis added) (citation omitted). This requirement remains an important part of the overall proof a defendant must meet to take advantage of extreme emotional distress special mitigation. *See infra* ¶ 45. And nothing in this opinion should be interpreted to the contrary. But it is also necessary that a defendant establish that he did, *in fact*, suffer "an extreme emotional reaction" and that, as a result, he experienced "a loss of self-control" and his reason was "overborne by intense feelings." *Lambdin*, 2017 UT 46, ¶ 15 (citation omitted). To hold otherwise would allow a sociopath who kills and whose reason was not overborne by intense feelings to still assert extreme emotional distress because the average reasonable person, confronted with the same circumstances as our sociopath, would have had his reason overborne. The law is not so loathsome.

defendant was exposed] would have an extreme emotional reaction to it, as a result of which he would experience a loss of self-control and that person's reason would be overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation, or other similar emotions," *Lambdin*, 2017 UT 46, ¶ 15 (citation omitted).

¶45 The reasonableness of the explanation or excuse for the defendant's extreme emotional distress "must be read in the context of the statute," which mitigates aggravated murder or murder, but "does not mitigate assault or any other criminal activity." *Id.* ¶ 38. Almost "all intentional homicides ... are abnormal acts for the perpetrators and the result of strong emotions and stresses." *White*, 2011 UT 21, ¶ 22 (citation omitted). The statute does not "extend[] to reduce murder to manslaughter simply because the average reasonable person might experience stress and anger in the circumstances, and consequently a heightened impairment to his decision making process and self-control." *Lambdin*, 2017 UT 46, ¶ 39. Instead, special mitigation only applies if "a reasonable person's self-control and ability to make a rational choice [would] be overwhelmingly and substantially undermined." *Id.* This distinction is necessary "so that this defense will only be applicable to those homicides which appropriately qualify under the underlying purpose of [the statute] and not *en masse* to all acts constituting murder." *White*, 2011 UT 21, ¶ 22 (citation omitted).

¶46 In *White*, we said that "[t]he standard is not whether the defendant thought her reaction was reasonable, but whether a reasonable person facing the same situation would have reacted in a similar way." *Id.* ¶ 37. Relying on this "similar way" language, the court of appeals determined that no reasonable person would have reacted in a similar way to Mr. Sanchez because of two distinguishing factors: "the extended period of torture leading up to the final suffocating blow and the calculation with which [Mr.} Sanchez admits he administered that blow." *Sanchez*, 2016 UT App 189, ¶ 45.

¶47 But in *Lambdin*, issued after the court of appeals' decision in this case, we clarified that "[t]he statute requires a reasonable explanation or excuse only for the extreme emotional distress, not for any subsequent action taken by the defendant." 2017 UT 46, ¶ 34 (citing UTAH CODE § 76-5-205.5). We recognized that "[o]nce the average reasonable person loses self-control, there could be a

wide range of actions that the now unreasonable person might take." *Id.* ¶ 35. The objective inquiry does not include "evaluat[ing] the reasonableness of the action ultimately taken." *Id.* Therefore, the "killing itself [need not] be reasonable." *Id.* ¶ 34.

¶48 The court of appeals was incorrect in examining whether a reasonable person would have murdered a romantic partner in a similar manner after finding out that he or she was cheating with the person's sibling. Instead, the appropriate objective inquiry is whether a reasonable person, under the then existing circumstances, would have lost self-control and had his or her ability to reason overborne by intense emotions upon finding out that a romantic partner of six months was cheating with the person's sibling.

¶49 We need not decide whether there is a reasonable likelihood that a jury would find extreme emotional distress to be *objectively reasonable* in this case because we conclude that there is no reasonable likelihood that a jury would find that Mr. Sanchez was *subjectively* acting under extreme emotional distress when he murdered the victim. Therefore, we vacate the court of appeals' decision on the extreme emotional distress standard but uphold their conclusion on other grounds.

2. There Is No Reasonable Likelihood That a Jury Would Have Concluded That Mr. Sanchez Was Subjectively Under Extreme Emotional Distress at the Time He Caused the Victim's Death

¶50 Based on the evidence that would have been admitted under rule 106, there is no reasonable likelihood that a jury would believe that Mr. Sanchez was subjectively under extreme emotional distress at the time of the victim's murder. Defense counsel was given an opportunity to proffer the evidence he would have introduced under rule 106. This proffer only contained two pieces of testimony relevant to extreme emotional distress. First, the detective testified that Mr. Sanchez said he was "enraged" when he found out that the victim was cheating on him with his brother, and "that's when he began the assault." Second, at some unidentified part of the assault, Mr. Sanchez asked the victim to say she would not cheat again, "but she wouldn't" say that, and "that hurt [his] feelings."

¶51 If they had been admitted, these two statements would have been the only evidence introduced at trial that would be relevant to the defendant's ability to meet the special mitigation standard. However, when these two statements are considered

against the backdrop of the other evidence introduced at trial, we are satisfied that there is no reasonable likelihood that a jury would find by a preponderance of the evidence that the defendant proved he was subjectively acting under extreme emotional distress when he killed the victim.

¶52 The two proffered statements only show that (1) Mr. Sanchez was enraged at the beginning of the torture and (2) at some unknown point during the torture he asked the victim to say she would stop cheating, and, when she would not, he had hurt feelings. But having "hurt feelings" simply does not demonstrate that Mr. Sanchez's "reason [was] overborne by intense feelings, such as passion, anger, distress, grief, excess agitation, or other similar emotions." *Bishop*, 753 P.2d at 471. And there is no evidence that would allow a jury to consider *when* Mr. Sanchez was suffering those "hurt feelings" during his attack on the victim. Without that information, the jury would have no evidence to connect those "hurt feelings" with the time that Mr. Sanchez caused the victim's death. And the statute requires that the actor be "under the influence of *extreme* emotional distress," not just "hurt feelings," "when the actor causes the death of another." UTAH CODE § 76-5-205.5(1) (emphasis added); *see also supra* ¶ 41 (requiring the extreme emotional reaction and loss of self-control to be contemporaneous).

¶53 Similarly, there is no evidence that Mr. Sanchez continued to feel "enraged" beyond the beginning of the attack. In fact, the two statements, taken together, make it clear that although Mr. Sanchez was "enraged" when he initiated his attack on the victim, at some point during that attack, his emotional level was downgraded to "hurt feelings." And there is no evidence that Mr. Sanchez again became enraged, or was under any other "intense feeling[]" that would qualify for extreme emotional distress. This solitary statement only possibly demonstrates that Mr. Sanchez was enraged at least seven hours before the victim's death. This does not show that any extreme emotional reaction Mr. Sanchez may have had was contemporaneous with his loss of self-control that led to the death of the victim. Nor does it show

that he was subjectively under the influence of extreme emotional distress when he caused the victim's death.[7]

¶54 When evaluating these statements, even considered in isolation, we see no reasonable likelihood that a jury would find by a preponderance of the evidence that Mr. Sanchez was subjectively under the influence of extreme emotional distress when he murdered the victim. Considering the other evidence presented at trial, it becomes even less likely that the jury would reach such a conclusion.

¶55 There was significant evidence introduced at trial that Mr. Sanchez was not experiencing "a loss of self-control and that [his] reason [was not] overborne by intense feelings" at the time he caused the victim's death. *Bishop*, 753 P.2d at 471. Several times during the torture, Mr. Sanchez attempted to undo or minimize the damage he had done. On multiple occasions, when the victim lost consciousness, Mr. Sanchez attempted to resuscitate her by breathing on her behalf. He also brought the victim to the bathroom and ran her head under water to try to wake her up and clean blood off her face. Additionally, Mr. Sanchez used hydrogen peroxide to try and clean the victim up.

¶56 Although Mr. Sanchez engaged in a brutal attack on the victim, there were multiple quiet periods of up to five minutes from one to six a.m. Over two hours before Mr. Sanchez finally strangled the victim, the downstairs neighbor stopped hearing frequent noises. And around an hour before the victim's death, the police showed up to the apartment, specifically listened at the door to see if they could hear noises coming from inside, and were unable to hear a sound. Unlike the previous hours, there were no

---

[7] We recognize that the medical examiner certified the victim's death "as resulting from multiple blunt force injuries and strangulation." And the blunt force injuries were so extensive that the medical examiner could not identify either as the sole cause of death, instead determining that it was "[t]he combined effects of both modalities" that led to her death. But this does not save Mr. Sanchez. He caused the victim's blunt force injuries over at least seven hours. And he has not attempted to tie being "enraged" or his "hurt feelings" to the injuries that caused the victim's death.

indications of tumultuous conduct around the time of the victim's death.

¶57 The deliberation and thought that Mr. Sanchez displayed when finally strangling the victim also helps discredit any notion that his ability to reason was overborne by intense feelings to such a point that his "ability to make a rational choice [was] overwhelmingly and substantially undermined." *Lambdin*, 2017 UT 46, ¶ 39.[8] After Mr. Sanchez began his final attempt to strangle the victim, he had the wherewithal to recognize that the method he was using was not working. Mr. Sanchez was able to use enough reason to change to a second method of strangling. And when the second method was similarly proving ineffective, he had the capacity to reason that he needed to try a third, and finally successful, method. A person subjectively suffering from extreme emotional distress—a person who has lost self-control and whose ability to reason is "overborne by intense feelings" to the point that his ability to think logically was "overwhelmingly and substantially undermined"—would not be capable of such a calculated choice.

¶58 Overall, Mr. Sanchez's minimal proffered evidence creates little, if any, potential argument that he was subjectively under the influence of extreme emotional distress when he finally caused the victim's death. And that argument becomes even more tenuous when considered with the other evidence presented at trial. Under this special mitigation statute, Mr. Sanchez bore the burden of proving extreme emotional distress by a preponderance of the evidence. Frankly, we see no reasonable likelihood that a jury would find that Mr. Sanchez had met his burden of proving that he was subjectively under extreme emotional distress. Therefore, if there were any error in not admitting the proffered evidence under rule 106, that error would be harmless.

---

[8] *Lambdin* sets forth this requirement as part of the objective, reasonable person test. 2017 UT 46, ¶ 39. But, as discussed, a defendant must prove that he or she was *subjectively* under extreme emotional distress that rises to the same level as that required by the *objective* prong. *See supra* ¶ 43 n.6.

**CONCLUSION**

¶59 We again leave open the question of when rule 106 can apply to writings or recorded statements not actually introduced into evidence and whether rule 106 defeats other rules of evidence that preclude admissibility. Since the court of appeals unnecessarily reached the issue of whether rule 106 overcomes other rules that preclude admissibility, and we do not weigh in on the issue, we vacate the rule 106 portion of the court of appeals' decision. Therefore, without deciding that the trial court's rule 106 determination was erroneous, we reach a determination as to the harmlessness of an error if it existed.

¶60 We conclude that if there were any error, it would have had no effect on the outcome of the case because there is no reasonable likelihood that any jury would have found that Mr. Sanchez was subjectively under extreme emotional distress at the time he committed the murder. Because the court of appeals reached its conclusion under an incorrect standard for whether a defendant was objectively under extreme emotional distress, we vacate that portion of the court of appeals' decision. We affirm the court of appeals on alternative grounds.

––––––––––