**2022 UT 30**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH
*Petitioner*,

*v.*

CHRISTOPHER JAMES BONDS,
*Respondent*.

No. 20191041
Heard September 17, 2021
Filed June 30, 2022

On Certiorari to the Utah Court of Appeals

Third District, Salt Lake
The Honorable Keith A. Kelly
No. 161912346

Attorneys:

Sean D. Reyes, Att'y Gen., Jeffrey S. Gray, Asst. Solic. Gen.,
Tony F. Graf, Salt Lake City, for petitioner

Nathalie S. Skibine, Salt Lake City, for respondent

JUSTICE PETERSEN authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, JUSTICE PEARCE, and JUDGE WILCOX joined.

ASSOCIATE CHIEF JUSTICE LEE filed an opinion concurring in part
and concurring in the judgment.

JUSTICE HIMONAS sat for oral argument in this case but retired on
March 1, 2022. DISTRICT JUDGE JEFFREY C. WILCOX participated as
his replacement.

JUSTICE HAGEN became a member of the Court on May 18, 2022,
after oral argument in this matter, and accordingly did not
participate.

JUSTICE PETERSEN, opinion of the Court:

### INTRODUCTION

¶1    After a night out at a bar, Christopher James Bonds shot

his friend Byron Williams in the back as Williams ran away from him. Williams died from his injuries. And Bonds was charged with his murder.

¶2   At trial, Bonds did not dispute that he killed Williams. But he argued that he did so only to protect his wife and children. During trial, the State disputed the genuineness of this defense. It elicited testimony from the police officer who arrested Bonds shortly after the shooting that Bonds had not said anything about protecting his family at the time of his arrest—although, the officer clarified that he had not questioned Bonds. In its closing argument, the State cast doubt on Bonds's defense by referencing his failure to explain to the arresting officer why he shot Williams—arguing that it was "common sense" that if you "shot someone in the back [and] you have an opportunity to tell your side of what happened . . . . Well, why didn't he say anything?"

¶3   At the end of trial, the district court instructed the jury on both self-defense and imperfect self-defense, the latter of which reduces the crime of murder to manslaughter if the defendant caused the death of another while incorrectly, but reasonably, believing that his conduct was legally justified or excused. Bonds agreed to the jury instructions. Ultimately, Bonds was convicted of murder and all but one of the related charges against him.

¶4   But the court of appeals vacated Bonds's convictions because it concluded his counsel had been ineffective in two respects. *State v. Bonds*, 2019 UT App 156, ¶ 65, 450 P.3d 120. First, it concluded counsel was deficient in failing to object to the "introduction and use of evidence about Bonds's silence while being arrested." *Id.* And second, it determined counsel was deficient in not objecting to the manslaughter jury instruction, which listed imperfect self-defense along with the affirmative elements of manslaughter and instructed the jury that to find Bonds guilty of manslaughter, it had to find that each element had been proven beyond a reasonable doubt. *Id.* ¶¶ 43, 65. The court concluded that this incorrectly reversed the burden of proof applicable to imperfect self-defense. *Id.* And it ultimately determined that these instances of deficient performance prejudiced Bonds. *Id.* ¶ 65.

¶5   On certiorari, we must decide whether the court of appeals correctly vacated Bonds's convictions based on ineffective assistance of counsel. We agree with the court of appeals that the manslaughter jury instruction incorrectly shifted the burden of proof for imperfect self-defense. And we agree that defense

counsel was ineffective for not objecting to this instruction. The law is less clear on the Fifth Amendment implications of commentary by the prosecution on an accused's silence after arrest but before *Miranda*[1] warnings have been given. However, even if we assume that counsel could have kept out this evidence and was ineffective for failing to object to it, we conclude that these errors did not prejudice Bonds.

¶6 Bonds had a gun and Williams was unarmed. And Bonds shot Williams in the back from ten feet away as Williams ran away from him. Assuming defense counsel had not made the errors discussed, it is still not reasonably likely that the jury would have convicted Bonds of manslaughter rather than murder based on a theory of imperfect self-defense.

¶7 Accordingly, we reverse the court of appeals' decision and reinstate the convictions that it vacated.[2]

## BACKGROUND[3]

¶8 Christopher Bonds, his wife Shania Bonds, his friend Byron Williams, and Williams's girlfriend Lena Valdez went to a bar together one evening. Shania's[4] mother watched the Bonds children while the adults were out. The Bondses lived in the upstairs apartment of a fourplex, and Shania's mother lived in the other upstairs apartment of the same building.

---

[1] *See Miranda v. Arizona*, 384 U.S. 486 (1966).

[2] Bonds was convicted of murder, felony discharge of a firearm with serious bodily injury, possession of a firearm by a restricted person, and two of the three counts of felony discharge of a firearm. The court of appeals reversed all of Bonds's convictions except for possession of a firearm by a restricted person, and remanded for a new trial. *State v. Bonds*, 2019 UT App 156, ¶¶ 18, 65, 450 P.3d 120.

[3] "When reviewing a jury verdict, we examine the evidence and all reasonable inferences in a light most favorable to the verdict, reciting the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Ray*, 2020 UT 12, n.2, 469 P.3d 871 (citation omitted).

[4] We refer to Shania Bonds by her first name to avoid confusion with defendant Bonds, with no disrespect intended.

¶9   At the bar, Bonds and Shania got in an argument with another patron. Shortly after 1:00 a.m., the party of four returned to the apartment complex. Bonds went inside his apartment and when he came back outside, he was holding a gun. Valdez overheard Bonds telling Shania that he and Williams were going to go back and "shoot up the bar." Valdez urged Williams, who also went by "Cheese," to stay behind. They argued, and she told him that if he went, she was done with him.

¶10  Shania picked up her children from her mother, and the women went to the Bondses' apartment. As Shania was closing the door behind them, they heard gunshots. Shania slammed and locked the door and Valdez dropped to the floor. Valdez heard four gunshots: "there was one and then . . . 10, 15 seconds later, there [were] three more."

¶11  Soon, Bonds was banging on the apartment door. As Shania let him in, Bonds "said that he had shot Cheese." Valdez ran to find Williams.

¶12  A resident of the apartment complex heard the gunshots and called 911 at 1:51 a.m. Meanwhile, Bonds left the apartment, eventually calling a friend for a ride about twenty minutes after the 911 call. He told the friend that he had killed Williams, but did not say anything during the six-minute conversation about why he had done it. The friend refused to pick him up.

¶13  When officers arrived at the apartment complex, they discovered Williams lying in the parking lot with a gunshot wound to the chest. Witnesses identified Bonds as the shooter, and officers on the scene described him over the radio, indicating that he was likely on foot. An officer spotted Bonds walking down the sidewalk and called in his location, after which several officers moved in and took Bonds into custody.

¶14  The officer who handcuffed Bonds observed dried blood on Bonds's shirt, watch, and knuckles. Between being handcuffed and being put in the police car, Bonds told the officer, "I don't have guns on me. I don't have any guns on me." During the drive to the police station, the officer did not question or *Mirandize* Bonds. And Bonds did not volunteer any information about why he shot Williams.

¶15  At the West Valley City police station, detectives interviewed Bonds the next morning. In the interrogation room, Bonds waived his *Miranda* rights and agreed to speak with the detectives. He gave "inconsistent accounts" about the evening. He

initially denied shooting Williams and told the detectives that the blood on him was "not from that, at all"; instead, it was from "an altercation" with an individual at the bar earlier. Bonds claimed he heard the gunshots after he left the apartment complex and said he "was never around, at the time, at all."

¶16 But eventually, Bonds confessed to shooting Williams. He gave detectives the following account of what happened. Bonds and Williams got into a fight outside in the stairway between Bonds's apartment and his mother-in-law's apartment, and Williams "got aggressive." Williams "tried to snatch the gun out of [Bonds's] hand," and they dropped the gun and it "went off automatically" as it hit the ground. Bonds confronted Williams about grabbing the gun, and Williams responded, "I should shoot this whole house, with these kids." Bonds "snapped . . . and [he] chased [Williams] and [he] shot three" while Williams "was running away." Bonds said Williams "was running . . . through the back, like goin towards the driveway where people park," and Williams was "about like 10 feet away" when Bonds shot him. Bonds said he "knew [he] could have" killed Williams if he had wanted to, but that wasn't what he was trying to do, he was "just trying to like . . . you goin too far, Dog." Bonds told detectives that Williams's threat sent him into "a rage." "I shot him, sir," Bonds told the detectives. "I didn't mean to, I was protecting my kids."

¶17 Williams arrived at the hospital unresponsive and was pronounced dead shortly thereafter. Bonds had shot Williams in the arm and back. The bullet to the back pierced Williams's lung and exited through the left side of his chest.

¶18 The State charged Bonds with murder; felony discharge of a firearm with serious bodily injury; purchase, transfer, possession, or use of a firearm by a restricted person; and three counts of felony discharge of a firearm.

¶19 At trial, defense counsel acknowledged Bonds shot Williams but argued he acted in defense of his wife and children. Bonds did not testify at trial. Instead, his counsel attempted to elicit evidence from the State's witnesses in support of Bonds's theory of imperfect self-defense.

¶20 In its case-in-chief, the State asked the arresting officer whether Bonds said anything at the time of his arrest about "trying to defend himself that night." The officer responded, "No, he did not." On cross-examination, however, the arresting officer admitted that he had included none of Bonds's comments during transport in his written report, and that he remembered none of

Bonds's exact words. On re-direct examination, the prosecutor then confirmed with the arresting officer that Bonds's post-arrest statements about not having a gun were unsolicited, and had the following exchange with the witness:

> Q: Did he say anything to you about defending himself that night?
>
> A: No, not that I can recall.
>
> Q: Did he say anything to you about defending others—his family, for example, that night?
>
> A: Not that I can recall.

¶21 Later, defense counsel elicited testimony in support of Bonds's defense-of-others claim during his cross-examination of the case agent who interviewed Bonds at the police station. Counsel asked:

> Q: In fact, you stated in your police report that it appears that [Bonds] was trying to protect Shania and his two kids because he didn't want anything to happen to them or have them seeing Cheese beating up his wife?
>
> A: Yes. That's what . . . he told me.
>
> Q: And you put that in your report?
>
> A: Yes.

And a few moments later in the same cross-examination, after refreshing the officer's recollection with his written report, defense counsel reiterated:

> Q: Right. And then you . . . said, "It was evident that you were only trying to protect Shania"?
>
> A: Based on the statements he had told me, yes.

¶22 During closing argument, the State referenced the evidence it had elicited from the arresting officer:

> It's important to know that [Bonds's] statement[] to [the arresting officer] was that he was not happy about being arrested, but he said nothing else about defending himself and others.

¶23 Defense counsel responded in his closing argument, saying:

[T]hey keep on saying that [Bonds] didn't say this or [Bonds] didn't say this, so it must be the opposite. . . . To imply that he has to stand up and just yell and scream or just say, "This is self-defense" . . . or "This is in defense of my kids," or anything like that . . . . He doesn't have to say anything. . . . It's not his burden. . . . [T]he burden falls . . . on the State. They have to prove it.

¶24 Defense counsel then emphasized Bonds's interview with detectives, where Bonds stated that Williams threatened to "shoot this whole house and these kids" and then ran "[r]ight to where [Shania's mother]'s house is."

¶25 On rebuttal, the prosecutor agreed that Bonds "doesn't have to say anything" and . . . "it's not his burden," but argued that Bonds's failure to tell the officer that he had been protecting his family called into question the sincerity of this defense. The prosecutor argued:

But common sense, now you shot someone in the back, you have an opportunity to tell your side of what happened, your version of what happened. Common sense would be: Well, why didn't he say anything? Why didn't he talk about self-defense, defense of others?

. . .

[Y]es, it's not his burden and he doesn't have to say anything, but he was given the opportunity to. Common sense. He was given the opportunity, he chose not to. Defense of his kids.

¶26 At the end of the trial, the court provided the jury with instructions on the law, including instructions related to self-defense and imperfect self-defense. The State and Bonds agreed to these instructions.

¶27 An instruction on the lesser included offense of manslaughter stated:

Before you can convict the Defendant, Christopher Bonds, of the lesser included offense of Manslaughter in Count 1 of the Information, you must find from all of the evidence and beyond a reasonable doubt each and every one of the following elements of that offense:

7

1. Christopher Bonds;

2. Did recklessly cause

3. The death of another

Or

1. Christopher Bonds;

2. Commits murder (See instruction no. 30)

but is found to having acted in accordance with an imperfect self defense. (See instruction no. 51)

After you carefully consider all the evidence in this case, if you are convinced that each and every element has been proven, beyond a reasonable doubt, then you must find the defendant[] GUILTY. On the other hand if you are not convinced that each and every element has been proven, beyond a reasonable doubt, then you must find the defendant NOT GUILTY.

¶28 Instruction 51, the imperfect self-defense instruction referenced in the manslaughter instruction, defined "imperfect self-defense" and correctly assigned the State the burden of proving beyond a reasonable doubt that Bonds had *not* acted in imperfect defense of others. This instruction stated:

"Imperfect self-defense" is a partial defense to only the charge of murder. It applies when the defendant caused the death of another while incorrectly, but reasonably, believing that his conduct was legally justified or excused. The effect of the defense is to reduce the crime[] of:

- "Murder" to "Manslaughter"[.]

The defendant is not required to prove that the imperfect self-defense applies. Rather, the State must prove beyond a reasonable doubt that the defense does not apply. The State has the burden of proof at all times. If the State has not carried this burden, the defendant may only be convicted of Manslaughter.

¶29 Bonds was convicted of murder and all of the other charges against him, except for one count of felony discharge of a firearm.[5]

¶30 Bonds appealed, arguing—among other things—that his counsel provided ineffective assistance due to his failure to object to two things: the manslaughter instruction incorrectly reversing the applicable burden of proof for imperfect self-defense, and the State's violation of his Fifth Amendment right against self-incrimination when it offered evidence that he did not talk about defending his family during his arrest and then used that evidence in its closing argument. *See State v. Bonds*, 2019 UT App 156, ¶ 20, 450 P.3d 120.

¶31 The court of appeals agreed with Bonds on both issues. *Id.* ¶ 65. It reversed all of Bonds's convictions except for possession of a firearm by a restricted person and remanded for a new trial. *Id.*

¶32 We granted the State's petition for certiorari. We exercise jurisdiction under Utah Code section 78A-3-102(3)(a).

**STANDARD OF REVIEW**

¶33 "On certiorari, this court reviews the decision of the court of appeals for correctness, giving no deference to its conclusions of law." *State v. Ray*, 2020 UT 12, ¶ 23, 469 P.3d 871 (citation omitted). "When we are presented with a claim of ineffective assistance of counsel, we review a lower court's purely factual findings for clear error, but [we] review the application of the law to the facts for correctness." *Id.* (alteration in original) (citation omitted) (internal quotation marks omitted).

**ANALYSIS**

¶34 The court of appeals concluded that Bonds's counsel was ineffective for failing to object to the manslaughter jury instruction and to the State's "introduction and use of evidence about Bonds's silence while being arrested." *State v. Bonds*, 2019 UT App 16, ¶ 65, 450 P.3d 120. We agree with the court of appeals that the manslaughter instruction incorrectly reversed the

_____

[5] In response to an unopposed defense motion, the court later merged the counts for murder and felony discharge of a firearm, resulting in the dismissal of count 2. *See State v. Bonds*, 2019 UT App 156, ¶ 18.

burden of proof applicable to imperfect self-defense and that defense counsel's failure to object to it was deficient. Whether counsel was deficient for failing to object to the State's use of Bonds's post-arrest, pre-*Miranda* silence is a closer call. However, even assuming that counsel was also deficient on this basis, we conclude that Bonds has not met his burden to establish prejudice.

¶35   To prove ineffective assistance of counsel, the defendant must establish two things: first, that trial counsel performed deficiently and second, that trial counsel's deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We begin by analyzing counsel's performance.

## I. DEFICIENT PERFORMANCE

¶36   The court of appeals found trial counsel rendered ineffective assistance in two respects. *State v. Bonds*, 2019 UT App 156, ¶ 65. We first address the court of appeals' conclusion that counsel was ineffective for failing to object to the manslaughter jury instruction.

### A. Jury Instructions

¶37   The court of appeals determined that trial counsel was deficient for failing to object to the manslaughter instruction. *Bonds*, 2019 UT App 156, ¶ 51. We agree.

¶38   As an initial matter, we conclude that the manslaughter instruction was legally incorrect because it misstated the burden of proof. Imperfect self-defense is an affirmative defense "available when the defendant 'caused the death of another . . . under a reasonable belief that the circumstances provided a legal justification or excuse for the conduct although the conduct was not legally justifiable or excusable under the circumstances.'" *Arriaga v. State*, 2020 UT 37, ¶ 21, 469 P.3d 914 (alteration in original) (quoting UTAH CODE § 76-5-203(4)(a)). Unlike "perfect" self-defense, if the jury finds a defendant acted in imperfect self-defense, the defendant is not acquitted. Instead, the murder conviction is reduced to a manslaughter conviction. *See* UTAH CODE § 76-5-203(4)(c)(i).

¶39 Once enough evidence is presented at trial to put imperfect self-defense "at issue," the burden rests on the State to disprove this affirmative defense beyond a reasonable doubt. *See State v. Bess*, 2019 UT 70, ¶ 34, 473 P.3d 157 (discussing the burden of proof for the affirmative defense of self-defense). But here, the manslaughter instruction treated imperfect self-defense as an

element of manslaughter that had to be affirmatively proven beyond a reasonable doubt. The instruction stated,

> Before you can convict the Defendant, Christopher Bonds, of the lesser included offense of Manslaughter in Count 1 of the Information, *you must find from all of the evidence and beyond a reasonable doubt each and every one of the following elements of that offense* . . . . Christopher Bonds . . . commits murder . . . *but is found to having acted in accordance with an imperfect self defense*. (See instruction no. 51)

*Supra* ¶ 27 (emphases added).

¶40 Thus, the jury was instructed that to convict Bonds of manslaughter (rather than murder) it had to find beyond a reasonable doubt that he acted in imperfect self-defense. This is an incorrect statement of the burden of proof. The State had the burden to prove beyond a reasonable doubt that Bonds *did not* act in imperfect self-defense. *See State v. Campos*, 2013 UT App 213, ¶ 38, 309 P.3d 1160 ("[O]nce a defendant has produced some evidence of imperfect self-defense, the prosecution is required to disprove imperfect self-defense beyond a reasonable doubt"). Bonds had no burden of proof. And therefore no party had the burden to prove beyond a reasonable doubt that Bonds *did* act in imperfect self-defense. So the instruction was legally wrong and tended to shift the burden of proof onto Bonds, the only party who had an interest in the jury finding that he "acted in accordance with an imperfect self-defense."

¶41 The State argues, however, that the jury instructions were correct when taken as a whole because the manslaughter instruction contained a cross-reference to another instruction that correctly defined imperfect self-defense and the applicable burden of proof. We agree, and Bonds does not contest, that the cross-referenced instruction was legally accurate.[6] However, while "we

---

[6] As previously noted, the cross-referenced instruction correctly defined imperfect self-defense, as follows:

> "Imperfect self-defense" is a partial defense to only the charge of Murder. It applies when the defendant caused the death of another while incorrectly, but reasonably, believing that his conduct was legally justified or excused. The effect of the defense is to reduce the crimes of "Murder" to "Manslaughter".

(continued . . .)

look at the jury instructions in their entirety" when determining whether they contain a legal error, *State v. Lambdin*, 2017 UT 46, ¶ 41, 424 P.3d 117 (citation omitted) (internal quotation marks omitted), one correct instruction does not necessarily correct another erroneous instruction, *see id.* ¶ 47 ("When an instruction completely misstates a legal standard, there is little chance that other instructions, read as a whole, will remedy the juror confusion that is likely to ensue."). *See also State v. Garcia*, 2016 UT App 59, ¶ 16, 370 P.3d 970, *aff'd in part*, *rev'd in part*, 2017 UT 53, 424 P.3d 171 ("[D]ueling instructions—in conflict as to how the jury should consider the defense—cannot satisfy [entitlement to a correct instruction].").[7]

¶42 Here, the two instructions are contradictory and create a confusing internal inconsistency within the instructions as a whole. The accurate imperfect self-defense instruction did not clarify a mere ambiguity. Rather, it conflicted with the legally incorrect manslaughter instruction. Accordingly, we conclude that

---

> The defendant is not required to prove that the imperfect self-defense applies. Rather, the State must prove beyond a reasonable doubt that the defense does not apply. The State has the burden of proof at all times. If the State has not carried this burden, the defendant may only be convicted of Manslaughter.

*Supra* ¶ 28.

[7] We cite *Lambdin* and *Garcia* in support of our conclusion that the correct imperfect self-defense instruction did not remedy the incorrect manslaughter instruction. Determining whether defense counsel's failure to object to the instruction amounted to deficient performance requires an additional analytical step: analyzing "whether correcting the error was sufficiently important under the circumstances that failure to do so was objectively unreasonable—i.e., a battle that competent counsel would have fought." *State v. Ray*, 2020 UT 12, ¶ 32, 469 P.3d 871. Accordingly, we do not disagree with the concurrence that this opinion does not create a "bright-line rule requiring an objection to any misleading instruction." *Infra* ¶ 64 n.2. Rather, as we will discuss, *infra* ¶¶ 43–49, we conclude that counsel was deficient here because under these particular circumstances, correcting the instruction was sufficiently important that counsel's failure to do so was objectively unreasonable.

the manslaughter jury instruction was legally erroneous, and this error was not remedied by the presence of an accurate imperfect self-defense instruction.

¶43 However, just because a legal error existed in the jury instructions does not necessarily mean that defense counsel's failure to object to the error amounted to deficient performance. A defendant shoulders a heavy burden when attempting to show defense counsel performed deficiently because there is a "strong presumption that trial counsel rendered adequate assistance and exercised reasonable professional judgment." *State v. Eyre*, 2021 UT 45, ¶ 22, 500 P.3d 776 (citation omitted). Defendants are entitled to "reasonable assistance," *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871, and there is a "wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689.[8] As we have explained,

> Defense counsel did not have a Sixth Amendment obligation to correct every error that might have occurred at trial, regardless of whether it affected the defendant. Counsel could pick his battles. We must view a decision to not object in context and determine whether correcting the error was sufficiently important under the circumstances that failure to do so was objectively unreasonable—i.e., a battle that competent counsel would have fought.

*Ray*, 2020 UT 12, ¶ 32.

¶44 Here, it was objectively unreasonable for counsel to agree to a jury instruction that incorrectly stated the burden of proof applicable to imperfect self-defense. The evidence left little doubt that Bonds shot Williams. And in light of the circumstances of the shooting—where Bonds shot Williams in the back from ten feet away as Williams ran away from Bonds—an acquittal based on

_____

[8] The State argues that counsel's performance is "objectively unreasonable only when it can be said that no competent attorney would have acted likewise." This language comes from *Premo v. Moore*, 562 U.S. 115, 124 (2011). But, as we have explained, "we do not understand *Moore* to change the deficiency standard announced in *Strickland*." *State v. Scott*, 2020 UT 13, ¶ 31, 462 P.3d 350. And at oral argument, the State agreed that the thrust of its point is that there is a wide range of reasonable professional assistance.

self-defense was highly unlikely. Imperfect self-defense was Bonds's only defense, and his only hope of avoiding a murder conviction. And it was unreasonable for defense counsel to accede to a jury instruction that incorrectly shifted the burden of proof for that defense onto Bonds. Accordingly, we must disagree with the concurrence's conclusion that counsel's decision not to object to the manslaughter instruction fell within the wide range of reasonable professional assistance. *Infra* ¶ 64 n.2. To the contrary, "correcting the error was sufficiently important under the circumstances that failure to do so was objectively unreasonable." *Ray*, 2020 UT 12, ¶ 32. And we agree with the court of appeals that defense counsel performed deficiently in this regard.

¶45 The State notes that correctly instructing juries on imperfect self-defense has proven challenging in numerous cases. *See, e.g., Campos*, 2013 UT App 213, ¶¶ 37–45 (holding that defense counsel's "failure to object to [a] verdict form fell below an objective standard of reasonableness" where the verdict form "require[d] an affirmative defense [of imperfect self-defense] to be established beyond a reasonable doubt," although a jury instruction correctly described imperfect self-defense); *State v. Lee*, 2014 UT App 4, ¶¶ 26–27, 318 P.3d 1164 (concluding that defense counsel "performed deficiently in failing to object" to a jury instruction on imperfect self-defense that "improperly placed the burden upon [the defendant] to prove his affirmative defense beyond a reasonable doubt," but holding this did not prejudice the defendant's conviction); *Garcia*, 2016 UT App 59, ¶¶ 14–16, (concluding that "the jury instructions regarding imperfect self-defense and attempted manslaughter were in direct conflict," and though two instructions correctly stated the law, that did not "remedy or cure" the other erroneous instructions). And it asks us to give some guidance in this area. We do so below, but we limit ourselves to the instructions before us and do not intend to prescribe the only way that a trial court could properly instruct a jury on imperfect self-defense.

¶46 The heart of the problem here is that when imperfect self-defense is listed as an affirmative element of the reduced offense of manslaughter, the instruction incorrectly reverses the burden of proof. *See supra* ¶ 27. *See also, e.g., Lee*, 2014 UT App 4, ¶ 27 (explaining that when "the jury was instructed . . . to find that all of the listed elements were proven beyond a reasonable doubt, including that Lee acted under a reasonable belief that his actions were legally justifiable," the "instruction improperly placed the burden upon Lee to prove his affirmative defense beyond a

reasonable doubt"); *Garcia*, 2016 UT App 59, ¶ 14 (noting that the imperfect self-defense instruction correctly stated the burden but an additional manslaughter instruction "incorrectly stated that the jury should convict Garcia of attempted manslaughter—thus giving Garcia the benefit of an imperfect self-defense finding—if the jury concluded that imperfect self-defense did *not* apply").

¶47 The Model Utah Jury Instructions (MUJI) Committee has noted this very problem:

> Instructing the jury on imperfect self-defense has proved to be problematic because many practitioners have tried to include the defense as an element of either or both of the greater crime and the reduced crime. The inevitable result is that the elements instruction on the reduced crime misstates the burden of proof on the defense as it applies to that reduced crime. *See*, *e.g.*, *State v. Lee*, 2014 UT App 4, 318 P.3d 1164.

Model Utah Jury Instructions, *CR1450 Practitioner's Note: Explanation Concerning Imperfect Self Defense*, (last revised 2019), *available at* https://www.utcourts.gov/resources/muji/inc_list.asp?action=showRule&id=42.

¶48 Here, the manslaughter instruction would have been legally correct if it had stated:

> Before you can convict the Defendant, Christopher Bonds, of the lesser included offense of Manslaughter in Count 1 of the Information, you must find from all of the evidence and beyond a reasonable doubt that:
>
> . . . .
>
> 1. Christopher Bonds;
>
> 2. Committed murder (See instruction no. 30)
>
> AND
>
> 3. The State has failed to prove beyond a reasonable doubt that Bonds did not act in imperfect self-defense. (See instruction no. 51)

¶49 Again, we do not hold that this is the only way to correctly instruct on imperfect self-defense. But when imperfect self-defense is at issue, the jury instructions as a whole must make clear that, in order to convict the defendant of murder, the jury

must find that the prosecution proved beyond a reasonable doubt that the defendant committed murder[9] and that the defendant *did not* act in imperfect self-defense. And to convict the defendant of manslaughter, the jury must find that the prosecution proved the defendant committed murder but *did not* prove that the defendant *did not* act in imperfect self-defense. Neither party has the burden to prove that the defendant *did* act in imperfect self-defense, and jury instructions should steer clear of such an implication.

*B. The State's Use of Bonds's Post-Arrest, Pre-Miranda Silence*

¶50 The court of appeals also determined that trial counsel acted deficiently when he did not object to 1) the State's elicitation from the arresting officer that Bonds did not mention at the time of his arrest that the reason he shot Williams was to defend his family, and 2) the State's argument in closing that this showed Bonds had not genuinely acted in defense of his family because if he had, it was "common sense" that he would have explained this to the officer. *See Bonds*, 2019 UT App 156, ¶¶ 17, 55.

¶51 The United States Supreme Court has not specifically addressed whether a prosecutor is constitutionally prohibited from commenting on a defendant's silence after arrest but before law enforcement's provision of *Miranda* warnings.[10] We also have

---

[9] We do not include a murder instruction here, as Bonds has raised no issue regarding the murder instruction given to the jury at his trial.

[10] The Fifth Amendment to the U.S. Constitution guarantees that no person "shall be compelled in any criminal case to be a witness against himself." The Supreme Court has made clear that it is a violation of the Fifth Amendment for the prosecution to use against a defendant the defendant's decision to not testify at trial, *Griffin v. California*, 380 U.S. 609, 613–14 (1965), and a defendant's silence after arrest and after law enforcement has administered the *Miranda* warnings, *Doyle v. Ohio*, 426 U.S. 610, 611 (1976). The Court has reasoned that once a person has been told they have "the right to remain silent," it is unconstitutional to then use their silence against them. *Id.* at 617–18. But the Supreme Court has also explained that "impeachment by use of *prearrest* silence does not violate the Fourteenth Amendment." *Jenkins v. Anderson*, 447 U.S. 231, 240 (1980) (emphasis added). However, the Court has not conducted this same analysis with respect to the prosecution's use of a defendant's silence during the period *after*
(continued . . .)

not spoken to this issue. Indeed, it is not directly presented here either, as the issue before us arises within the framework of ineffective assistance of counsel. So instead of being directly presented with this issue, we are asked whether defense counsel was deficient in not objecting when the State elicited evidence of Bonds's post-arrest, pre-*Miranda* silence and commented on it during closing arguments.

¶52   The State argues that counsel's decision to not object was not unreasonable, because counsel could have believed the objection would fail.[11] And the State suggests various ways in

---

*arrest but before the* Miranda *warnings*, and where the defendant does not testify at trial. *But see Fletcher v. Weir*, 455 U.S. 603, 607 (1982) ("In the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence *when a defendant chooses to take the stand*." (emphasis added)). The federal courts that have done so are split. *See United States v. Frazier*, 408 F.3d 1102, 1110–11 (8th Cir. 2005) (noting a "conflict of authority on the question," and holding in that case that the defendant's rights were not violated because "there was no governmental action at that point inducing his silence," but also noting that "[w]e do not decide today whether compulsion may exist under any other postarrest, pre-*Miranda* circumstances"); *United States v. Rivera*, 944 F.2d 1563, 1568 (11th Cir. 1991) ("The government may comment on a defendant's silence when it occurs after arrest, but before *Miranda* warnings are given."). *But see United States v. Hernandez*, 948 F.2d 316, 322-24 (7th Cir. 1991) (concluding that a prosecutor's commentary on a defendant's post-arrest, pre-*Miranda* silence violated the defendant's Fifth Amendment privilege); *United States v. Velarde-Gomez*, 269 F.3d 1023, 1030 (9th Cir. 2001) ("[T]he government may not comment on a defendant's post-arrest, pre-*Miranda* silence in its case-in-chief because such comments would act [] as an impermissible penalty on the exercise of the . . . right to remain silent. We conclude[] that regardless [of] whether the *Miranda* warnings [are] actually given, comment on the defendant's exercise of his right to remain silent [is] unconstitutional.") (second, third, sixth, and seventh alterations in original) (internal quotation marks omitted).

[11] The State cites *Brecht v. Abrahamson*, 507 U.S. 619 (1993), which states that "the Constitution does not prohibit the use for

(continued . . .)

which counsel's decision may have been strategic. But ultimately, we need not resolve whether counsel was deficient in this respect, because even assuming he was, Bonds has failed to show prejudice.

## II. PREJUDICE

¶53 "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *State v. Scott*, 2020 UT 13, ¶ 43, 462 P.3d 350 (quoting *Strickland*, 466 U.S. at 691). To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.[12]

¶54 We ultimately conclude that if these errors had not occurred—in other words, if the jury instructions had correctly and consistently stated the burden of proof applicable to imperfect self-defense and the State had not elicited testimony about and made reference to Bonds's silence at the time of his arrest—there is no reasonable probability that the outcome of Bonds's trial would have been different. Bonds's argument is that, absent these errors, there is a reasonable probability that the jury would have convicted him of manslaughter rather than murder based on a finding that the State had not disproven that he acted in imperfect defense of his family. But here, the jury was correctly instructed that imperfect self-defense "applies when the

---

impeachment purposes of a defendant's silence prior to arrest, *or after arrest if no* Miranda *warnings are given*." *Id.* at 628 (emphasis added). However, *Brecht* says this in the context of impeachment, and cites to *Fletcher v. Weir*, 455 U.S. 603 (1982), which speaks specifically in terms of impeachment when a defendant testifies at trial. *Id.* at 606–07. And Bonds did not testify at his trial.

[12] In its analysis, the court of appeals expounded upon the meaning of a "reasonable probability" as being similar to a "significant possibility." *Bonds*, 2019 UT App 156, at ¶ 56. But we endeavor to hew closely to the words used by the Supreme Court in *Strickland*. So we adhere to the "reasonable probability" standard and the Supreme Court's analysis and application of this phrase.

defendant caused the death of another while incorrectly, but reasonably, believing that his conduct was legally justified or excused."

¶55 And there is no reasonable probability that under the facts here, a reasonable jury could have found that the State failed to disprove that Bonds *reasonably* believed he was legally justified in shooting Williams. When Bonds fired at Williams, he had a gun and Williams did not. He shot Williams in the back three times from about ten feet away. He admitted that Williams was "running away" from him, and that he "chased" Williams.

¶56 The only evidence supporting Bonds's theory of the case was Bonds's own statements to detectives that Williams had said he would "shoot this whole house and these kids," and that he shot Williams to protect his family. Bonds also highlights that, as Williams ran away, he ran in the direction of Bonds's mother-in-law's apartment, where Bonds's children had been staying. And we note that the prosecutor did not dispute that Williams "ran in [the] direction" of Shania's mother's house. Bonds argues that this could have caused the jury to conclude that Bonds reasonably feared Williams was a danger to his children. There is some dispute about whether Bonds thought his children were still at his mother-in-law's apartment at the time of the shooting, because Shania had already taken them back to Bonds's apartment. But even assuming this fact in Bonds's favor, there is no evidence tending to show that Bonds could have had a reasonable belief that Williams was an imminent danger to his children as Williams ran, unarmed, in their general direction.

¶57 Indeed, there was no evidence at trial that Bonds himself held such a belief, even subjectively. Bonds described his actions to detectives not as attempting to stop Williams before Williams reached his children, but as anger at and punishment of Williams based on his incendiary comments about Bonds's family. In his interview, Bonds alleged

> And he said some crazy shit, whatever, like I'll shoot this whole house and these kids, whatever, some shit and I'm like you say what, like you gonna be fucked up and . . . that's when I shot. That shit put me in a rage, like . . . my kids in this, I don't give a fuck who you is, like my kids . . . . Nobody gonna hurt my kids. I coulda killed him if I wanted to. But I wasn't doing that. Just showing him you're doing too much, Man. Going too far, dog.

¶58 In light of these facts, even if the manslaughter instruction had been correct and the State made no mention of Bonds's silence at the time of his arrest, we cannot conclude that there is a reasonable probability that the jury would have convicted him of manslaughter rather than murder or that the outcome of the trial would have otherwise been different.

## CONCLUSION

¶59 We affirm the court of appeals' holding that Bonds's trial counsel performed deficiently in failing to object to a jury instruction that misallocated the burden of proof as to imperfect self-defense. But even assuming counsel was also deficient for not objecting to the State's use of Bonds's post-arrest, pre-*Miranda* silence against Bonds, we conclude that Bonds has not carried his burden of proving that had these errors not occurred, there was a reasonable probability that the outcome of the trial would have been different. Accordingly, Bonds's claim of ineffective assistance of counsel fails. We reverse and reinstate his convictions.

———————

ASSOCIATE CHIEF JUSTICE LEE, concurring in part and concurring in the judgment:

¶60 I concur in the court's decision to reverse the court of appeals and reinstate the convictions at issue. And I likewise concur in the bulk of the majority opinion. I write separately, however, because I disagree with the court's conclusion that trial counsel was deficient in failing to object to the jury instructions on imperfect self-defense.[1] *See supra* Part I.A.

¶61 Admittedly, instruction number 35 was not a model of clarity. If read in isolation, this instruction could have been interpreted to suggest that Bonds bore a burden of proof on imperfect self-defense. *See supra* ¶ 40. In light of the potential for confusion, I have no doubt that many reasonable defense lawyers would have objected to this instruction.

———————

[1] The majority's contrary conclusion is unnecessary to its judgment in any event given that the court goes on to conclude that there is no reasonable likelihood that the lack of an objection affected the jury's verdict. *See supra* Part II. For that reason I concur in the judgment of the court despite my disagreement with the analysis in Part I.A. of the opinion.

LEE, A.C.J., concurring in part and concurring in the judgment

¶62 But that is not the question presented for our decision. We do not read jury instructions in isolation. And under *Strickland v. Washington*, 466 U.S. 668 (1984), we do not hold trial counsel to a standard of "best practice," or require that they object to any instruction that is potentially confusing or even incorrect. *See State v. Ray*, 2020 UT 12, ¶ 32, 469 P.3d 871. The governing standard "indulge[s] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* ¶ 34 (quoting *Strickland*, 466 U.S. at 689). And that presumption leaves room for counsel to "pick his battles" without an obligation to "correct every error that might have occurred at trial." *Id.* ¶ 32.

¶63 I would resolve the question addressed in Part I.A. of the majority opinion under these standards. I would hold that Bonds's defense counsel was "pick[ing] his battles" in forgoing an objection to instruction 35. And I would conclude that the decision to do so fell within the "wide range of reasonable professional assistance" that Bonds was entitled to under *Strickland*.

¶64 Instruction 35 created a potential for confusion—in a requirement that the jury find "beyond a reasonable doubt each and every one of the" listed "elements" of the offense of manslaughter, with a list that included a determination that Bonds "acted in accordance with an imperfect self-defense." In context, that reference could lead to confusion as to who bore the burden of proof on imperfect self-defense. But instruction 35 did not expressly assign a burden of proof to the defense. And the instructions elsewhere eliminated any possible confusion. Instruction 35 included an express cross-reference to instruction 51. And instruction 51 cured any potential confusion by speaking expressly—and quite correctly—to the burden of proof on imperfect self-defense. *See supra* ¶ 41 (conceding this point).[2]

---

[2] The majority cites *State v. Lambdin*, 2017 UT 46, ¶ 47, 424 P.3d 117, and *State v. Garcia*, 2016 UT App 59, 370 P.3d 970, *aff'd in part, rev'd in part*, 2017 UT 53, 424 P.3d 171, in support of its conclusion that instruction 51 did not adequately "correct" the error it finds in instruction 35. *Supra* ¶ 41. But these cases are unhelpful to the majority for two reasons. First, instruction 35 does not contain the kind of errors highlighted in these cases—a direct "misstate[ment]" of the operative "legal standard," as in *Lambdin*, 2017 UT 46, ¶ 47, or a "dueling
(continued . . .)

LEE, A.C.J., concurring in part and in the judgment

¶65 The jury instructions at issue were not perfect. But Bonds had no right to an ideal defense. *See Strickland*, 466 U.S. at 689. He had a right to a defense that fell within the "wide range of reasonable professional assistance." *Id.* A lawyer acting within that wide range could reasonably decide to forgo an objection to the potential confusion in instruction 35 in light of the explicit clarification provided in instruction 51.

---

instruction[]" that openly "conflict[s]" with another, as in *Garcia*, 2016 UT App 59, ¶ 16. Instruction 35, on its own, is confusing; but it doesn't directly misstate the law, or expressly assign the burden of proof on imperfect self-defense to Bonds. And that distinguishes this case from those cited by the majority.

The cited cases are also distinguishable in a second way: Neither of them is rooted in a governing standard for a claim for ineffective assistance. The *Lambdin* case arose in the context of a preserved objection to a jury instruction. *See* 2017 UT 46, ¶ 10. So the *Lambdin* analysis is unhelpful to our resolution of a case arising under a claim for ineffective assistance. The cited *Garcia* opinion does arise in the context of a claim for ineffective assistance. *See* 2017 UT 53, ¶ 48. But the majority is relying on an opinion of the Utah Court of Appeals, whose analysis of the claim for ineffective assistance was reversed by this court on certiorari.

The majority notes that the cited language in *Garcia* is from a portion of the court of appeals' opinion dealing separately with the question whether a jury instruction was accurate—as an antecedent to the court's analysis of a claim for ineffective assistance of counsel. *See supra* ¶ 41 n.5. And it emphasizes that its own approach similarly bifurcates the threshold question of whether the instructions were in error from the ultimate question of whether a decision to forgo an objection fell short of the standard of minimal competence guaranteed to Bonds. *Id.*

I take the point as far as it goes. But without the support of the cited authority, the majority is left with a narrow, fact-intensive basis for its holding. The court is not establishing a bright-line rule requiring an objection to any misleading instruction. It is simply concluding that it believes that "correcting" the error at issue here "was sufficiently important under the circumstances that failure to do so was objectively unreasonable." *Supra* ¶ 44 (citation omitted). We disagree on that ultimate point. But our point of disagreement is narrow and fact-intensive.

L<small>EE</small>, A.C.J., concurring in part and concurring in the judgment

¶66 I respectfully concur in the court's judgment on that basis.

_____